Nos. 2-09-1283 & 2-10-0162 cons.          Filed: 12-22-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| HELPING OTHERS MAINTAIN ENVIRONMENTAL STANDARDS, LEROY BEHRENS, LAUREL BEHRENS, MARY JO BURKE, JUANITA CROPPER, JEFFREY GRAVES, DEAN B. HICKS, KATHLEEN M. HICKS, STEVE HOLESINGER, WILL LIBERTON, LORI RUNKLE, and RICHARD RUNKLE, | ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Jo Daviess County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 08--CH--42 |
| A.J. BOS, TRADITIONS INVESTMENTS, LLC, and THE DEPARTMENT OF AGRICULTURE, | ) ) ) ) ) | Honorable Kevin J. Ward, |
| Defendants-Appellants. | ) | Judge, Presiding. |

| | | |
|---|---|---|
| HELPING OTHERS MAINTAIN ENVIRONMENTAL STANDARDS, LEROY BEHRENS, LAUREL BEHRENS, MARY JO BURKE, JUANITA CROPPER, JEFFREY GRAVES, DEAN B. HICKS, KATHLEEN M. HICKS, STEVE HOLESINGER, WILL LIBERTON, LORI RUNKLE, and RICHARD RUNKLE, | ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Jo Daviess County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 08--CH--42 |
| A.J. BOS, TRADITIONS INVESTMENTS, LLC, and THE DEPARTMENT OF | ) ) ) | |

| AGRICULTURE, | ) | Honorable |
| | ) | Kevin J. Ward, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiffs, Helping Others Maintain Environmental Standards (HOMES), Leroy Behrens, Laurel Behrens, Mary Jo Burke, Juanita Cropper, Jeffrey Graves, Dean B. Hicks, Kathleen M. Hicks, Steve Holesinger, Will Liberton, Lori Runkle, and Richard Runkle, sought to halt the construction of a "megadairy" by defendants A.J. Bos and Traditions Investments, LLC (collectively Bos). Plaintiff HOMES is a not-for-profit corporation that was organized to oppose the livestock facility's construction. The remaining plaintiffs are individuals living in the general vicinity of the proposed dairy in Nora, Illinois. After Bos obtained approval from defendant the Department of Agriculture (Department) to begin construction, plaintiffs brought suit against Bos and the Department. The Department moved to dismiss the counts against it, and its motion was granted. Plaintiffs obtained a preliminary injunction against Bos, effectively halting construction of the livestock facility, but they were subsequently denied a permanent injunction. In appeal No. 2--10--0162, plaintiffs argue that: (1) they have standing to seek judicial review of the Department's approval to begin construction, (2) the trial court erred in a number of its evidentiary rulings, and (3) the trial court's denial of a permanent injunction is against the manifest weight of the evidence. We allowed the Illinois chapter of the Sierra Club, the Illinois Council of Trout Unlimited, and the Prairie Rivers Network to file a joint amicus curiae brief in support of plaintiffs. In appeal No. 2--09--1283, which has been consolidated with plaintiffs' appeal, Bos argues that the trial court erred in denying his motion to dissolve the preliminary injunction and that he is entitled to damages. We affirm the trial court's judgment in all respects.

I.  BACKGROUND

A. Bos Obtains Departmental Approval

On October 31, 2007, Bos filed with the Department notices of intent to construct two livestock management facilities.  The proposed dairies were named "Tradition North" and "Tradition South" and were located in Nora Township, Jo Daviess County.  Each dairy would have 6,850 "animal units" in the form of dairy cows and calves.[1]  The Tradition South dairy's plans, as amended, proposed to use three livestock waste holding ponds, one with dimensions of 300 by 855 by 20 feet; the second 760 by 850 by 20 feet; and the third 400 by 400 by 20 feet.  Bos sought the Department's approval of the dairies pursuant to the Livestock Management Facilities Act (Livestock Act) (510 ILCS 77/1 et seq. (West 2008)).

In accordance with the Livestock Act, the Department sent notice of the intent to construct to the Jo Daviess County Board (Board), and the Board requested that the Department hold an informational meeting on the proposed construction.  See 510 ILCS 77/12(a) (West 2008); 8 Ill. Adm. Code §900.403 (Conway Greene CD-ROM June 2002).  At the meeting, the Department was required to receive evidence on the following eight siting criteria:  whether (1) registration and livestock waste management plan certification requirements were met by the notice of intent to construct; (2) the design, location, or proposed operation would protect the environment by being consistent with the Livestock Act; (3) the location minimized incompatibility with the area's character by being zoned for agriculture or complying with the Livestock Act's setback requirements; (4) if the facility was in a 100-year flood plain or an environmentally sensitive area (defined as a karst area or

---

[1]A milking dairy cow is 1.4 animal units while a young dairy cow is 0.6 animal units.  510 ILCS 77/10.10 (West 2008).

with aquifer material within five feet of the bottom of the waste facility), the proposed construction standards were consistent with protecting the area's safety; (5) the owner or operator submitted plans to minimize the likelihood of environmental damage from spills, runoff, and leaching; (6) odor control plans were reasonable and incorporated odor reduction technologies; (7) traffic patterns minimized the effect on existing traffic flow; and (8) construction of the facility was consistent with community growth, tourism, recreation, or economic development through compliance with applicable zoning and setback requirements. 510 ILCS 77/12(d) (West 2008).

The informational meeting took place on January 10, 2008, and the public was allowed to ask questions and make comments. See 510 ILCS 77/12(a) (West 2008). On January 31, 2008, the Jo Daviess County Development and Planning Committee voted to recommend to the Board that the proposed dairies did not meet all eight siting criteria. On February 11, 2008, the Board found that five of the eight siting criteria had not been met and voted 11 to 5 to recommend that the Department not approve the dairies. See 510 ILCS 77/12(b) (West 2008) (the county board shall submit an advisory, nonbinding recommendation to the Department as to whether the proposed facility meets the eight siting criteria). However, on May 30, 2008, the Department ruled that it was "more likely than not" that the Livestock Act's provisions had been met regarding the Tradition South facility, and it approved its construction. See 510 ILCS 77/12.1 (West 2008) (if the Department determines that it is "more likely than not" that the Livestock Act's provisions have been met, construction of the facility may proceed). Bos was subject to inspection by the Department before, during, and after construction. 510 ILCS 77/13(g) (West 2008); 8 Ill. Adm. Code §900.505 (Conway Greene CD-ROM June 2002). Bos did not subsequently pursue approval of the Tradition North facility.

One of the main controversies surrounding the approval of the Tradition South dairy was whether it was in a "karst area" under the Livestock Act. The Livestock Act defines "karst area" as "an area with a land surface containing sinkholes, large springs, disrupted land drainage, and underground drainage systems associated with karstified carbonate bedrock and caves or a land surface without those features but containing a karstified carbonate bedrock unit generally overlain by less than 60 feet of unconsolidated materials." 510 ILCS 77/10.24 (West 2008). "Karstified carbonate bedrock" is defined as "a carbonate bedrock unit (limestone or dolomite) that has a pronounced conduit or secondary porosity due to dissolution of the rock along joints, fractures, or bedding plains." 510 ILCS 77/10.26 (West 2008). Under administrative regulations, if the "proposed livestock waste handling facility is to be located within an area designated as 'Sink hole areas' on 'Karst Terrains and Carbonate Rocks of Illinois', IDNR-ISGS Illinois Map 8"[2] (Map 8), or if soil samples from within 20 feet of the livestock waste handling facility boundaries indicate that the waste handling facility is in a "karst area," additional inspections and tests are required (35 Ill. Adm. Code §§506.302(b), (g) (Conway Greene CD-ROM June 2002)). If a livestock waste handling facility is in a karst area, the waste facility must be designed to prevent seepage of waste into groundwater (510 ILCS 77/13(b)(2) (West 2008); 35 Ill. Adm. Code §506.312(a) (Conway Greene CD-ROM June 2002)) and is to be constructed using a rigid material such as concrete or steel (35 Ill. Adm. Code §506.312(b), amended at 25 Ill. Reg. 14883, eff. November 15, 2001. However, the facility's owner or operator may receive the Department's permission to "modify or exceed these standards in order to meet site specific objectives." 35 Ill. Admin. Code §506.312(c), amended at 25 Ill. Reg. 14883, eff. November 15, 2001. In such a situation, the owner or operator must demonstrate that the

_____

[2]The dairy site is <u>not</u> in a sinkhole area according to Map 8.

modification is at least as protective of the groundwater, surface water, and structural integrity of the waste facility as are the regulation's requirements. 35 Ill. Adm. Code §506.312(c), amended at 25 Ill. Reg. 14883, eff. November 15, 2001. No livestock waste facility may be constructed within 400 feet of a natural depression in a karst area. 510 ILCS 77/13(b)(2) (West 2008); 35 Ill. Adm. Code §506.302(g)(1) (Conway Greene CD-ROM June 2002).

### B. Plaintiffs File Suit

On June 3, 2008, plaintiffs filed a petition with the Department, seeking reconsideration or a stay of the construction approval. The Department responded that plaintiffs did not have standing to challenge its administrative decision.

Also on June 3, 2008, plaintiffs filed a five-count complaint against defendants in the trial court. Count I was directed against both defendants. It alleged individual plaintiffs' concerns regarding ground water contamination and air pollution from the facilities. It alleged that the bedrock underlying and surrounding the dairy sites was made up of "Galena Group Carbonate Rock" with karst features, which constituted a karst aquifer, meaning that it was highly susceptible to groundwater contamination by the seepage of animal waste. Count I alleged that Bos's proposed waste handling ponds were not going to be constructed using a rigid material such as concrete or steel, but rather compacted soil, and would therefore leak. It further alleged that the Livestock Act's requirements for minimum setback distances from residences had not been met. See 510 ILCS 77/35(c) (West 2008). Count I sought a declaratory judgment that the livestock facilities were in violation of the Livestock Act; a declaratory judgment that the Department's decision that Tradition South complied with the Livestock Act was "unlawful, illegal and void"; and preliminary and permanent injunctions enjoining Bos from constructing and operating the livestock facilities.

The remaining counts were directed against Bos. Count II alleged public nuisance based on noise, offensive odors, groundwater contamination, increased vehicle traffic, interference and annoyance impairing the use of plaintiffs' property, inconvenience, injury to health, diminution in property values, and damage to the area's reputation. Count II further alleged that the dairies would violate plaintiffs' state constitutional right to a healthful environment and would constitute public nuisances pursuant to statute. Count II sought an order temporarily restraining Bos from proceeding with construction of the facilities; preliminary and permanent injunctions enjoining Bos from constructing and operating the facilities; and a declaration that the operation was a nuisance.

Count III alleged common-law public nuisance and count IV alleged common-law private nuisance. Both sought the same relief as count II. Count V alleged common-law continuing trespass and contained many of the same allegations as the nuisance counts. It also requested the same relief, except that it requested a declaration that the operation was a continuing trespass.

Further on June 3, 2008, the trial court denied plaintiffs' emergency motion for a temporary restraining order. On June 26, 2008, plaintiffs filed a motion requesting certiorari review of the Department's administrative decision allowing construction to begin on Tradition South and requesting a stay of construction.

On October 20, 2008, after conducting evidentiary hearings, the trial court granted plaintiffs a preliminary injunction against Bos. It found that all of the witnesses testified credibly at the hearing but that plaintiffs' witnesses' testimony was more directly related to the issue of whether a nuisance or trespass was likely to stem from the operation of the Tradition South dairy. In contrast, Bos's witnesses were interested parties because they were employed by Bos for the project, and their testimony was directed more toward compliance with the Livestock Act than the likelihood of

nuisance or trespass from the facility's operation. The trial court found that: plaintiffs had made a prima facie showing of a fair question about the existence of their claimed right not to be subject to nuisance or trespass by the proposed dairy; groundwater contamination from the proposed facility would constitute a substantial future harm; the facility presented a high probability of a public and private nuisance by creating an environment injurious to the health and welfare of surrounding citizens and the public at large; plaintiffs therefore had no adequate remedy at law and irreparable harm was likely to result without a preliminary injunction; the circumstances led to a reasonable belief that plaintiffs would be entitled to the relief sought; and the balance of hardships between Bos's right to lawful use of his property and the health and safety of plaintiffs and the public favored the issuance of a preliminary injunction. Bos was enjoined from operating a "concentrated proposed livestock management facility" as defined by statute, stabling more then 199 cows, and using any aboveground or in-ground waste storage structures or runoff holding ponds for livestock waste.

On December 3, 2008, plaintiffs added count VI to their complaint. Count VI was directed at both defendants and sought declaratory judgments that the Tradition South dairy: was in violation of the Environmental Protection Act (415 ILCS 5/1 et seq. (West 2008)), the Illinois Groundwater Protection Act (415 ILCS 55/1 et seq. (West 2008)), and the Livestock Act and would constitute a public nuisance. Plaintiffs further sought a declaration that the Department's decision allowing construction of the facility was "unlawful, illegal and void." Plaintiffs also requested preliminary and permanent injunctions enjoining Bos from constructing and operating the facilities.

On December 17, 2008, the Department filed a combined motion under section 2--619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2--619.1 (West 2008)) to dismiss plaintiffs' claims against it. The Department attacked the format of the complaint under section 2--615 of the Code

(735 ILCS 5/2--615 (West 2008)), arguing that it alleged multiple causes of action in a single count. The Department alternatively argued that the complaint should be dismissed under section 2--619 of the Code (735 ILCS 5/2--619 (West 2008)) because plaintiffs lacked standing to bring their claims against it. The Department referred to its contemporaneously filed response to plaintiffs' motion for writ of certiorari. In the response, the Department argued that plaintiffs' request for certiorari should be denied because it was brought as a motion rather than as a petition. The Department further argued that plaintiffs lacked standing to challenge the Department's decision because they were not parties to the administrative proceeding. Bos later joined in the Department's motion to dismiss.

On January 15, 2009, the trial court denied plaintiffs' motion for a writ of certiorari and granted the Department's section 2–619 motion to dismiss the claims against it, contained in counts I and VI. As to Bos, the trial court also granted the section 2–619 motion to dismiss counts I and VI, except it denied the motion with respect to plaintiffs' request for a declaratory judgment that the dairy would constitute a public nuisance. The trial court further granted the section 2–615 motion to dismiss the complaint but provided plaintiffs leave to file an amended complaint.

Plaintiffs filed a three-count, first amended complaint on February 3, 2009. The complaint did not name the Department as a defendant or list any claims against it. Count I contained largely the same allegations as the original count, and it sought a declaratory judgment that the proposed livestock facilities would constitute a public nuisance. Count II sought a declaratory judgment that the proposed livestock facility would constitute a private nuisance, and count III sought a declaratory judgment that the facility would constitute a continuing trespass. All three counts sought preliminary and permanent injunctions enjoining Bos from constructing and operating the facility.

Later in February 2009, Bos sought removal of the case to federal court on the basis that there was a diversity in citizenship because the Department was no longer a party to the action. The federal court denied removal on the ground that the counts against the Department were involuntarily dismissed.

On May 13, 2009, Bos moved to dismiss the first amended complaint. On June 2, 2009, the trial court orally granted the motion in part, and it gave plaintiffs leave to file a second amended complaint. Plaintiffs filed that complaint on June 11, 2009. Plaintiffs' second amended complaint renamed the Department as a defendant and added Traditions Investments, LLC, as a defendant. Count I sought a declaratory judgment that the proposed facility (Tradition South) would constitute a public nuisance; count II sought a declaratory judgment that it would constitute a private nuisance; count III sought a declaratory judgment that it would constitute a continuing trespass; and count IV sought preliminary and permanent injunctions enjoining Bos from constructing and operating the dairy. Counts V and VI were listed as former counts I and VI of plaintiffs' original complaint. The counts stated that they had been dismissed on January 15, 2009, and count VI specifically stated that it was being repled for purposes of appeal.

On October 16, 2009, Bos filed a motion to dissolve the preliminary injunction, arguing that plaintiffs' experts' claims were unsupported by fact and rose only to the level of speculation and conjecture. The trial court denied the motion on November 10, 2009.

### C. Trial

A trial on the permanent injunction took place from November 23, 2009, to December 10, 2009. We summarize the voluminous trial testimony in an unpublished portion of this opinion.

## D. Trial Court's Ruling

The trial court issued a written judgment on December 15, 2009, stating as follows. In order to obtain a permanent injunction, plaintiffs had to prove by a preponderance of the evidence that it was highly probable that the operation of Bos's livestock facility would constitute a public nuisance, a private nuisance, or a trespass. Individual plaintiffs who testified expressed concern that the dairy would emit light, noise, odor, dust, and other airborne particles, and would generate traffic, so as to constitute a nuisance or trespass. Although their "allegations and concerns [may have been] understandable, they [were] not competent evidence of prospective nuisance or trespass and [did] not contribute to overcoming the burden of proof."

The trial court's judgment further stated that the competent evidence plaintiffs presented showed that the gist of their claims was that the waste containment pond liners were inadequately designed because they did not take into consideration that the proposed facility's site was underlain by karst. Therefore, the contaminants would allegedly leak into the surface water, groundwater, and an underlying aquifer, and move into plaintiffs' wells and public waterways. This evidence primarily came from Samuel Panno and Peter Huettl. Numerous exhibits showed that Huettl relied heavily on Panno's opinions to form his own opinions. However, on cross-examination, Panno admitted that a site-specific investigation was needed for a thorough geological assessment of a site. Panno further:

"admitted that there were a number of tests which could have been performed which would provide a more definitive indicator of the presence of karst, including ground water chemistry evaluation, well monitoring, and dye tracing. These tests were not performed because of their expense. Mr. Panno also admitted that he never examined rock corings from the site and never sought bacterial well data for the area. He admitted that these things were not

prohibitively expensive, he could have done them, and he should have done them as they would have been informative as to the question of karst."

Plaintiffs' evidence was otherwise vague as to the specific types of alleged contaminants, their concentrations, and their release mechanisms.

The trial court stated that in contrast, Bos's experts' opinions were based on regional and site-specific investigations. David Trainor and Brett Naugle examined rock corings, and Naugle considered well data. Naugle concluded that there was no evidence of karstified carbonate bedrock at the site. Trainor concluded that the site did not have any karst features, the facility design would protect the environment, and any releases from the waste holding ponds would be minimal and would not migrate. The trial court concluded that Bos's evidence should be given greater weight, meaning that plaintiffs did not prove by a preponderance of the evidence that it was highly probable that the livestock facility would lead to a public or private nuisance, or trespass. The trial court therefore entered judgment for Bos. Plaintiffs timely appealed.

## II. ANALYSIS

We preliminarily address plaintiffs' motion, ordered taken with this case, to strike Bos's statement of facts. Plaintiffs argue that, contrary to Supreme Court Rules 341(h)(6) and (i) (210 Ill. 2d Rs. 341(h)(6), (i)), Bos's statement of facts is argumentative and conclusory. While we agree that Bos's recitation of facts contains some conclusory statements and highlights only evidence favorable to Bos, the facts included are supported by the record and serve to supplement plaintiffs' two page statement of facts in their appeal. Accordingly, we deny plaintiffs' motion.

### A. Standing to Seek Review of Department's Administrative Decision

Turning to the merits, plaintiffs first argue that they have standing to seek judicial review of the Department's administrative act of finding that it was "more likely than not" that the Tradition South facility met the Livestock Act's provisions, which allowed Bos to begin construction of the dairy. Plaintiffs argue that at stake is their health, welfare, safety, property, and way of life, as well as those of future generations. Plaintiffs maintain that they adequately alleged that allowing the dairy would result in a specific, legally cognizable injury to their personal interests as well as to their constitutional right to a healthful environment. Plaintiffs note that the Livestock Act provides that it is the state's public policy to "maintain an economically viable livestock industry *** while protecting the environment for the benefit of both the livestock producer and persons who live in the vicinity of a livestock production facility." 510 ILCS 77/5(b) (West 2008). Plaintiffs argue that the Department violated numerous statutory and regulatory requirements by approving Tradition South, including, among others: that livestock waste handling facilities in a karst area be designed to prevent seepage of stored material into groundwater (510 ILCS 77/13(b)(2) (West 2008)); minimum setback distances (510 ILCS 77/35(c)(4) (West 2008)); that livestock management facilities not contain streams within their boundaries (35 Ill. Adm. Code §501.402(a) (1991)); and that such facilities have adequate odor control methods and technology so as not to cause air pollution (35 Ill. Adm. Code §501.402(c)(3) (1991)).

Defendants argue that plaintiffs have forfeited their claims against the Department, because plaintiffs amended their complaint after the counts against the Department were dismissed but did not reallege the dismissed counts or name the Department as a party. The Department states that plaintiffs never served it with any amended complaints, nor did it receive notice of any subsequent court hearings on the matter.

Plaintiffs counter that their final amended complaint incorporated the claims dismissed by the trial court on January 15, 2009, thereby preserving them for review.

The record shows that plaintiffs did not include the Department as a party in their first amended complaint, nor did that complaint allege any claims against it. However, the record also shows that plaintiffs' second amended complaint, which ended up being their final complaint, named the Department and referenced the dismissed counts. Therefore, the question before us is whether plaintiffs forfeited their claims against the Department by not including the Department in their first amended complaint, or whether plaintiffs could preserve the claims by including the Department in their final amended complaint.

Our supreme court has stated that once a party files an amended pleading, he forfeits any objection to the trial court's rulings on former complaints. Boatmen's National Bank of Belleville v. Direct Lines, Inc., 167 Ill. 2d 88, 99 (1995). Our supreme court has also stated that "[w]here an amendment is complete in itself and does not refer to or adopt the prior pleading, the earlier pleading ceases to be a part of the record for most purposes, being in effect abandoned and withdrawn." Bowman v. County of Lake, 29 Ill. 2d 268, 272 (1963). While these general propositions appear to support defendants' position, our supreme court has also more directly stated that **"allegations in former complaints, not incorporated in the final amended complaint, are deemed waived."** (Emphasis added.) Foxcroft Townhome Owners Ass'n v. Hoffman Rosner Corp., 96 Ill. 2d 150, 155 (1983); see also Zurich Insurance Co. v. Baxter International, Inc., 173 Ill. 2d 235, 243 (1996) (appellate court erred in addressing issues not raised in the "final version" of the plaintiff's complaint); Boatmen's National Bank of Belleville, 167 Ill. 2d at 99 (where the plaintiffs' "final amended complaint" did not incorporate certain allegations, the plaintiffs waived objections to the trial court's dismissal of prior complaints). In Foxcroft, our supreme court explained that **the purpose of this rule is the efficient and orderly administration of justice, in that the trial court can expect that a case will go to trial on**

the claims in the final amended complaint, thereby allowing it to be aware of the points in issue and properly rule on trial objections. Foxcroft, 96 Ill. 2d at 154. Our supreme court stated that while a defendant would be disadvantaged if a plaintiff were allowed to proceed to trial on different issues in different complaints, there was "no undue burden in requiring a party to incorporate into its final pleading all allegations which it desires to preserve for trial or review." (Emphases added.) Foxcroft, 96 Ill. 2d at 154. Accordingly, we conclude that by reincorporating the dismissed counts into their final complaint, plaintiffs preserved them for review.

Although the Department argues that it never received service on the amended complaints or subsequent proceedings, the Department has not cited any authority for the proposition that such service was required for plaintiffs to preserve their claims, thereby forfeiting the argument for review. 210 Ill. 2d R. 341(h)(7); Hirsch v. Optima, Inc., 397 Ill. App. 3d 102, 108 (2009) (failure to cite authority results in forfeiture of arguments). Bos cites Ryan v. School District No. 47, 267 Ill. App. 3d 137, 141-42 (1994), for the proposition that plaintiffs were required to serve the Department with a new summons, but that case relates to an amended complaint filed after a voluntary dismissal, which is not what occurred here.

The Department argues that even if plaintiffs preserved the claims they repled in the second amended complaint, they did not replead a count seeking certiorari review of the Department's decision and have therefore forfeited that issue on appeal. However, plaintiffs brought the certiorari request as a motion, and the trial court ruled on it as a motion. When the trial court enters a final order, all prior nonfinal orders become appealable (Hampton v. Cashmore, 265 Ill. App. 3d 23, 25 (1994)), and here plaintiffs specifically referenced the denial of the motion for certiorari in their notice of appeal. Further, the motion requested that the trial court rule that their complaint was legally sufficient to warrant treatment as a complaint for certiorari. Even otherwise, courts have also held that a complaint improperly seeking review of an

administrative decision under the Administrative Review Law (735 ILCS 5/3-101 et seq. (West 2008)) or through a declaratory judgment should be treated as a petition for a writ of certiorari. Chicago Title Land Trust Co. v. Board of Trustees, 376 Ill. App. 3d 494, 501 (2007). Accordingly, we conclude that plaintiffs sufficiently preserved the certiorari issue for review.

Turning to the merits, defendants argue that plaintiffs lacked standing to seek administrative review of the Department's decision because they were not parties of record in the administrative proceeding before the Department. Lack of standing is an affirmative defense that the defendant has the burden to plead and prove (Lebron v. Gottlieb Memorial Hospital, 237 Ill. 2d 217, 252 (2010)), and it may be asserted in a motion to dismiss under section 2–619(a)(9) of the Code (735 ILCS 5/2–619(a)(9) (West 2008); International Union of Operating Engineers, Local 148 v. Illinois Department of Employment Security, 215 Ill. 2d 37, 45 (2005)). We review de novo the grant of a motion to dismiss under section 2--619. Doe A. v. Diocese of Dallas, 234 Ill. 2d 393, 396 (2009).

Plaintiffs challenge the Department's administrative decision that the Tradition South facility "more likely than not" met the provisions of the Livestock Act, which entitled Bos to begin construction of the facility. The Illinois Constitution gives courts jurisdiction to review administrative decisions "as provided by law." Ill. Const. 1970, art. VI, §§6, 9. Whether a court may review an agency's action is a question of statutory construction. Outcom, Inc. v. Illinois Department of Transportation, 233 Ill. 2d 324, 332 (2009). Often, the agency's enabling statute expressly provides for review under the Administrative Review Law. Outcom, Inc., 233 Ill. 2d at 333. If the enabling statute does not adopt the Administrative Review Law or provide for another form of review, and the statute does not bar review or call for unreviewable agency discretion, review may be obtained by a common-law writ of certiorari. Outcom, Inc., 233 Ill. 2d at 333. Here, the Livestock Act does not provide for review under the Administrative Review Law but also does not limit review. The relevant

administrative regulation states that the Department's decision of whether it is more likely than not that the Livestock Act's provisions have been met becomes final on the date of the decision. 8 Ill. Adm. Code §900.407(f), amended at 27 Ill. Reg. 18553, 18555, eff. November 25, 2003. It further states that the "procedure for stay or reconsideration of any final Department decision by the Department shall be as provided for in the Department's administrative rules." 8 Ill. Adm. Code §900.407(f), amended at 27 Ill. Reg., 18553, 18555, eff. November 25, 2003. The relevant rule gives a "respondent" 30 days from the date of the decision to request that the Department reconsider or stay its decision. 8 Ill. Adm. Code §1.114 (1992). Thus, neither the Livestock Act nor the Department's regulations provide for review under the Administrative Review Law or prohibit judicial review, meaning that judicial review is possible through a writ of <u>certiorari</u>.

The Department does not dispute that <u>certiorari</u> review is applicable to its decision but rather argues that plaintiffs do not have standing to seek review. We agree. The right to review administrative decisions is limited to those who were both parties of record to the agency proceeding and aggrieved by the agency's decision. <u>Williams v. Department of Labor</u>, 76 Ill. 2d 72, 78-79 (1979); <u>Kemp-Golden v. Department of Children & Family Services</u>, 281 Ill. App. 3d 869, 873-77 (1996) (mother of child who was allegedly abused by his father did not have standing to seek judicial review of agency's decision to expunge the "indicated" report of abuse against the father, even though the mother testified at the administrative hearing). Here, nothing in the Livestock Act gives plaintiffs status as parties of record. Plaintiffs argue that such a restriction is limited to review under the Administrative Review Law. However, "[c]ircuit courts 'do not possess greater authority to review actions by agencies whose final decisions are reviewable through common-law methods than the courts have when statutory procedures apply,' " and the standards of review are "essentially the

same." Outcom, Inc., 233 Ill. 2d at 336-37, quoting Dubin v. Personnel Board, 128 Ill. 2d 490, 498 (1989). Thus, the standing requirement would be the same whether the agency decision were reviewed under the Administrative Review Law or pursuant to a writ of certiorari.

Plaintiffs rely on Greer v. Illinois Housing Development Authority, 122 Ill. 2d 462 (1988), to support standing. There, the plaintiffs filed suit against the Illinois Housing Development Authority (IHDA) for approving mortgage financing for a housing rehabilitation project. Greer, 122 Ill. 2d at 470-71. They alleged that the approval violated the IHDA's statutory duty to promote economic heterogeneity. Greer, 122 Ill. 2d at 485. The IHDA argued that the plaintiffs lacked standing to challenge its funding of the project and its approval of the tenant-selection plan. Greer, 122 Ill. 2d at 487. The supreme court disagreed, stating that "standing in Illinois requires only some injury in fact to a legally cognizable interest," which the plaintiffs satisfied by alleging a diminution in their property values. Greer, 122 Ill. 2d at 492-94. Plaintiffs here argue that they similarly alleged a decrease in property values, as well as injury to other legally cognizable interests. However, Greer is distinguishable from this case because it involved a "nonadjudicatory administrative decision[]" (Greer, 122 Ill. 2d at 501) by a "body politic and corporate" (Greer, 122 Ill. 2d at 477) rather than an agency's quasi-judicial decision as to whether a party has satisfied specific statutory factors. That is, nothing in Greer overruled the general requirement that a party seeking review of an agency's decision (which is typically quasi-judicial) must have been a party of record to the agency's proceeding and aggrieved by the agency's decision. See Williams, 76 Ill. 2d at 78-79.

Plaintiffs also cite article XI of the Illinois Constitution (Ill. Const. 1970, art. XI). Section 1 of article XI provides that it is the state's public policy and each person's duty "to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy." Ill. Const. 1970, art XI, §1. Section 2 states, "Each

person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law." Ill. Const. 1970, art. XI, §2. While section 2 refers to individuals being able to enforce their right to a healthful environment, that section did not create any new causes of action but instead eliminated the need to show a special injury as is traditionally required in environmental nuisance cases. City of Elgin v. County of Cook, 169 Ill. 2d 53, 85 (1995); see also Glisson v. City of Marion, 188 Ill. 2d 211, 228 (1999). Thus, article XI does not provide plaintiffs with an independent basis to seek review of the Department's decision. See NBD Bank v. Krueger Ringier, Inc., 292 Ill. App. 3d 691, 698 (1997) (the plaintiffs could not bring an environmental claim under the Illinois Constitution alone but rather needed a cognizable cause of action).

Plaintiffs further argue that they are entitled to a declaration of their rights with respect to the Department's administrative decision that Tradition South "more likely than not" met the Livestock Act's provisions. A declaratory judgment action requires: (1) a plaintiff with a tangible, legal interest; (2) a defendant with an opposing interest; and (3) an actual controversy between the parties concerning such interests. 735 ILCS 5/2--701 (West 2008); Country Mutual Insurance Co. v. D&M Tile, Inc., 394 Ill. App. 3d 729, 733 (2009). However, a writ of certiorari, rather than a declaratory judgment action, is the proper means to challenge an administrative decision to which the Administrative Review Law does not apply. Chicago Title Land Trust Co., 376 Ill. App. 3d at 501; Alicea v. Snyder, 321 Ill. App. 3d 248, 252-53 (2001). Regardless, the court's authority to review an agency's decision would be the same whether the review were through a declaratory judgment or a writ of certiorari (Outcom, Inc., 233 Ill. 2d at 336-37, and we have determined that plaintiffs do not have standing to seek such review.

B.   Implied Right of Action

Plaintiffs argue that if parties like them cannot enforce the legislative limitations on the Department's ability to grant permits to construct livestock facilities like the proposed megadairy, nobody can. We examine this argument in conjunction with plaintiffs' argument that a private right of action may be implied under the Livestock Act against both Bos and the Department.

This court has said that the Livestock Act does not contain any mechanism to prevent or punish violations of its provisions, nor did it create any remedy, either public or private, for such violations. Nickels v. Burnett, 343 Ill. App. 3d 654, 661 (2003). This statement is not accurate to the extent that the Livestock Act does provide for various penalties, including monetary penalties and orders to cease operation, for: beginning construction without filing notice with the Department (510 ILCS 77/11(d) (West 2008)); failing to construct a livestock waste lagoon in accordance with the construction plan and Department recommendations (510 ILCS 77/15(f) (West 2008)); violating waste lagoon inspection requirements (510 ILCS 77/16 (West 2008)); not reporting the release of 25 gallons or more of animal waste into the water (510 ILCS 77/18 (West 2008)); failing to prepare and maintain a waste management plan (510 ILCS 77/20(g) (West 2008)); and violating odor control requirements (510 ILCS 77/25 (West 2008)).

It is true that the Livestock Act contains no explicit language providing a private remedy. **Still, a private right of action may be implied from a statute if: (1) the plaintiff is a member of the class for whose benefit the legislature enacted the statute; (2) the statute was designed to prevent the plaintiff's injury; (3) a private right of action is consistent with the statute's underlying purpose; and (4) implying a private right of action is necessary to provide an adequate remedy for violations of the statute.** Fisher v. Lexington Health Care, Inc., 188 Ill. 2d 455, 460 (1999). A court should use caution in implying a private right of action, because, in doing so, it is assuming the policy-making authority more appropriately exercised by the legislature. Moore v. Lumpkin, 258 Ill. App. 3d 980, 989

(1994).  In determining whether a private right of action exists, we focus primarily on the legislature's intent in enacting the statute, which is best ascertained from the statute's language.  Moore, 258 Ill. App. 3d at 989.  The interpretation of a statute is a question of law, which we review de novo.  In re J.L., 236 Ill. 2d 329, 339-40 (2010).

Section 5 of the Livestock Act is entitled "Policy" and states:

"(a) The General Assembly finds the following:

(1) Enhancements to the current regulations dealing with livestock production facilities are needed.

(2) The livestock industry is experiencing rapid changes as a result of many different occurrences within the industry including increased sophistication of production technology, increased demand for capital to maintain or expand operations, and changing consumer demands for a quality product.

(3) The livestock industry represents a major economic activity in the Illinois economy.

(4) The trend is for larger concentration of animals at a livestock management facility due to various market forces.

(5) Current regulation of the operation and management of livestock production is adequate for today's industry with a few modifications.

(6) Due to the increasing numbers of animals at a livestock management facility, there is a potential for greater impacts on the immediate area.

(7) Livestock waste lagoons must be constructed according to standards to maintain structural integrity and to protect groundwater.

(8) Since a majority of odor complaints result from manure application, livestock producers must be provided with an educational program that will enhance neighbor awareness and their environmental management skills, with emphasis on management of livestock wastes.

(b) Therefore, it is the policy of the State of Illinois to maintain an economically viable livestock industry in the State of Illinois while protecting the environment for the benefit of both the livestock producer and persons who live in the vicinity of a livestock production facility." (Emphasis added.) 510 ILCS 77/5 (West 2008).

We initially note that a case relied on by plaintiffs, Citizens Opposing Pollution v. ExxonMobil Coal U.S.A., No. 5--09--0207 (September 24, 2010), is not helpful to our analysis. There, the appellate court held that the trial court erred in dismissing a count on the basis that the Water Use Act of 1983 (Water Use Act) (525 ILCS 45/1 et seq. (West 2008)) provided no private right of action, because section 8.05 of the Surface Coal Mining Land Conservation and Reclamation Act (225 ILCS 720/8.05 (West 2008)), also at issue in the case, specifically allowed for such enforcement actions. Citizens Opposing Pollution, slip op. at 18. But here, the Livestock Act does not explicitly provide for a private right of action.

We now consider the four factors to determine whether a private right of action may be implied in light of section 5 in conjunction with the entire Livestock Act. Regarding the first factor, plaintiffs are members of a class for whose benefit the statute was enacted, in that the statute's policy provision specifically references protecting the environment for the benefit of people living near the livestock facility. Still, this factor is tempered in that this is not the only class the legislature intended the statute to benefit; the legislature also sought to protect the environment for the livestock

producer's benefit. Regarding the second factor, the types of injuries that plaintiffs allege will occur, such as groundwater contamination and excessive odors, are the types of injuries that the Livestock Act was designed to prevent. However, on the third factor, implying a private right of action is not consistent with the statute's underlying purpose. "Where broad discretion is given to an agency, it negates the implication that there was legislative intent to create a private right of action." Moore, 258 Ill. App. 3d at 996. The Livestock Act gives citizens some input through informational meetings but ultimately gives the Department the discretion to determine whether is it more likely than not that the statutory provisions have been met, as required for construction of the livestock facility to commence. See 510 ILCS 77/12.1 (West 2008). Inspections and violation determinations are also left to the Department. Implying a private right of action would strongly undermine the Department's authority, contrary to the legislature's intent. See Moore, 258 Ill. App. 3d at 998 ("an implied private right of action is inconsistent with the legislature's purpose to establish a regulatory scheme [to protect against contagious diseases] under the direction of the Department of Public Health").

We similarly conclude that the fourth factor is not satisfied. A private right of action will be implied only where there is a clear need to uphold and implement the public policy of the statute by providing an adequate remedy for a violation of the statute. Abbasi v. Paraskevoulakos, 187 Ill. 2d 386, 393 (1999); see also Fisher, 188 Ill. 2d at 464 (a private right of action will be implied only where the statute would, as a practical matter, otherwise be ineffective). Here, livestock operators are subject to the fines discussed earlier, as well as orders to cease operations, for violations of the Livestock Act's provisions. See Rekosh v. Parks, 316 Ill. App. 3d 58, 74 (2000) (the Funeral Directors and Embalmers Licensing Code (225 ILCS 41/1--1 et seq. (West 1998)) provided for disciplinary actions and fines, so its remedies were not so deficient as to require implying a private

right of action); NBD Bank, 292 Ill. App. 3d at 697 (the Illinois Environmental Protection Act (415 ILCS 5/1 et seq. (West 1996)) provided for prosecution by the State and allowed contribution claims against third-party violators, so there was no need to imply a private right of action).

Further, the Livestock Act specifically states that nothing in it "shall be construed as a limitation or preemption of any statutory or regulatory authority under the Illinois Environmental Protection Act [(415 ILCS 5/1 et seq. (West 2008))]." 510 ILCS 77/100 (West 2008). We have recognized that the Livestock Act does not preempt other statutory and common-law causes of action, such as nuisance. Nickels, 343 Ill. App. 3d at 661. Thus, while the Livestock Act does not allow an individual to file suit in an attempt to enforce its provisions, it also does not prohibit the individual from using other statutory or common-law causes of action to challenge the construction of a livestock facility. Our supreme court has held that where a common-law action effectively implemented a statute's underlying policy, a private right of action was unnecessary. See Abbasi, 187 Ill. 2d at 395-96 (a common-law negligence action effectively implemented the policy behind the Lead Poisoning Prevention Act (410 ILCS 45/1 et seq. (West 1996)), so it was not necessary to imply a private right of action).

As this court recognized, a party attempting to construct a livestock facility "could gain complete Departmental approval and permission in his endeavors, and yet still have those endeavors halted *** should his operations run afoul of other statutory or common-law prohibitions." Nickels, 343 Ill. App. 3d at 661-62. That is precisely what occurred here, as in spite of the Department's approval allowing Bos to begin construction, plaintiffs were able to pursue their common-law claims against Bos, obtain a preliminary injunction effectively preventing construction of the livestock facility, and have a full trial on their right to a permanent injunction. Based on the penalties the

Livestock Act provides for noncompliance and the availability of related common-law actions, a private right of action is not necessary as an enforcement mechanism for the Livestock Act.

Plaintiffs relatedly argue that the trial court failed to consider violations of numerous statutory and regulatory provisions as evidence of statutory nuisance. Plaintiffs' argument is without merit, as the trial court allowed evidence related to statutory and regulatory requirements as evidence of the standard of care required. We consider the trial court's final ruling in conjunction with plaintiffs' argument that its decision was against the manifest weight of the evidence.

### C. Evidentiary Rulings

Plaintiffs next challenge a number of the trial court's evidentiary rulings. They argue that the trial court erred in: (1) refusing to allow into evidence public records and Illinois State Geological Survey records; (2) refusing to allow plaintiffs to read Bos's sworn answers to interrogatories into evidence; (3) refusing to allow plaintiffs' rebuttal evidence; (4) excluding plaintiffs' expert medical evidence; (5) not considering plaintiffs' lay opinion evidence as competent to contribute toward overcoming the burden of proof; and (6) refusing to allow evidence from the hearing on the preliminary injunction at the hearing on the permanent injunction. We discuss these evidentiary rulings in an unpublished portion of this opinion.

### D. Trial Court's Denial of Permanent Injunction

Plaintiffs' final argument is that the trial court's ruling denying them a permanent injunction is against the manifest weight of the evidence. A party seeking a permanent injunction, which serves to maintain the status quo indefinitely (Alpha School Bus Co. v. Wagner, 391 Ill. App. 3d 722, 743-44 (2009)), must show that he has a clear and ascertainable right that needs protection, there is no adequate remedy at law, and he will suffer irreparable harm if injunctive relief is not granted (Kopchar

v. City of Chicago, 395 Ill. App. 3d 762, 772 (2009)).  A court considering injunctive relief should also balance the equities.  County of Kendall v. Rosenwinkel, 353 Ill. App. 3d 529, 538 (2004).  It is the trier of fact's role to resolve conflicts in the evidence, assess witnesses' credibility, and determine the weight to be given to their testimony.  Prairie Eye Center, Ltd. v. Butler, 329 Ill. App. 3d 293, 298-99 (2002).  A trial court's factual findings will not be reversed unless they are against the manifest weight of the evidence.  Prairie Eye Center, Ltd., 329 Ill. App. 3d at 299.  We typically apply the abuse-of-discretion standard to review a trial court's decision of whether to grant a permanent injunction.  See Rosenwinkel, 353 Ill. App. 3d at 541.  But cf. O'Donnell v. City of Chicago, 363 Ill. App. 3d 98, 104 (2005) (issuance of a permanent injunction is generally reviewed under a manifest-weight-of-the-evidence standard).  However, where a trial court's decision regarding a permanent injunction is based on pure questions of fact, such as here, we will not reverse its decision unless it is against the manifest weight of the evidence.  Hasco, Inc. v. Roche, 299 Ill. App. 3d 118, 126 (1998).

Plaintiffs alleged claims of public nuisance, private nuisance, and trespass.  Regarding public nuisance, plaintiffs cite section 47--5(3) of the Criminal Code of 1961 (720 ILCS 5/47--5(3) (West 2008)), which states that it is a public nuisance to "corrupt or render unwholesome or impure the water of a spring, river, stream, pond, or lake to the injury or prejudice of others."  Plaintiffs argue that they alleged and established that the dairy would constitute a public nuisance in violation of section 47--5(3) by leaking substantial amounts of animal waste into the groundwater and corrupting the water of a stream.  Bos rightly points out that only the State's Attorney may prosecute public nuisances as criminal offenses.  Jamison v. City of Zion, 359 Ill. App. 3d 268, 272 (2005).  However, plaintiffs would still have a common-law claim of public nuisance.  Donaldson v. Central Illinois

Public Service Co., 199 Ill. 2d 63, 101 (2002), overruled on other grounds, In re Commitment of Simons, 213 Ill. 2d 523, 530 (2004).

A public nuisance is something that negatively affects the public's health, safety, or morals, or causes substantial annoyance, inconvenience, or injury to the public. Village of Wilsonville v. SCA Services, Inc., 86 Ill. 2d 1, 21-22 (1981). The elements of public nuisance are: (1) the existence of a public right; (2) the defendant's substantial and unreasonable interference with that right; (3) proximate cause; and (4) injury. City of Chicago v. Beretta U.S.A. Corp., 213 Ill. 2d 351, 369 (2004). A private nuisance is the substantial invasion of a person's interest in the use and enjoyment of his land. In re Chicago Flood Litigation, 176 Ill. 2d 179, 204 (1997). The invasion must be substantial, intentional or negligent, and unreasonable. In re Chicago Flood Litigation, 176 Ill. 2d at 204. Whether particular conduct constitutes a nuisance is determined by the conduct's effect on a reasonable person. In re Chicago Flood Litigation, 176 Ill. 2d at 204. A "nuisance must be physically offensive to the senses to the extent that it makes life uncomfortable." Dobbs v. Wiggins, 401 Ill. App. 3d 367, 375-76 (2010).

Here, the alleged nuisance was prospective because the dairy had not yet been built. A plaintiff may seek injunctive relief for a prospective nuisance. Village of Wilsonville, 86 Ill. 2d at 25. A " 'defendant may be restrained from entering upon an activity where it is highly probable that it will lead to a nuisance, although if the possibility is merely uncertain or contingent he may be left to his remedy after the nuisance has occurred.' " Village of Wilsonville, 86 Ill. 2d at 26, quoting W. Prosser, Torts §90, at 603 (4th ed. 1971). The plaintiff must show by a preponderance of the evidence that the defendant's operation is a prospective nuisance. Village of Wilsonville, 86 Ill. 2d at 14.

The type of invasion that constitutes a nuisance differs from the type of invasion that constitutes a trespass. " 'A nuisance is an interference with the interest in the private use and enjoyment of the land, and does not require interference with the possession' " whereas a " 'trespass is an invasion of the interest in the exclusive possession of land, as by entry upon it.' " In re Chicago Flood Litigation, 176 Ill. 2d at 204, quoting Restatement (Second) of Torts §821D, Comment d, at 101 (1979). Trespass can occur through a negligent or an intentional act. Lyons v. State Farm Fire & Casualty Co., 349 Ill. App. 3d 404, 410 (2004).

As the trial court pointed out, plaintiffs' claims were largely based on allegations that, if the Tradition South dairy were allowed to be constructed and operated according to Bos's plans, contaminants from the livestock waste holding ponds would leak through the clay liners to karstified carbonate bedrock below, reaching the groundwater and aquifer below the ponds and polluting plaintiffs' wells and the public waterways. Peter Huettl provided expert testimony regarding the permeability of the clay liner and the soil underneath the liner. However, he admitted that he believed that it was never appropriate to use an unprotected clay liner for an animal waste holding pond, and he acknowledged that he had been involved in the design of only two animal waste containment liners. He also testified that he did not do a site-specific analysis or take into account information from the three test pits on the site. Most importantly, Huettl testified that he relied on Samuel Panno's reports in forming his opinion that the waste material would reach the groundwater, thus making Panno's testimony that there was karstified carbonate bedrock below the Tradition South site a crucial component of plaintiffs' case.

Panno testified that his opinion was based on LiDAR (laser) imagery, examination of aerial photographs, and field investigations. He used the LiDAR imagery to find linear features that could

indicate fractures in the carbonate rock, and he testified that one lineament went through a waste holding pond. However, Panno admitted that lineaments were just an interpretative tool to indicate where to look for more information. Panno testified that one aerial photograph showed what appeared to be a spring on the site, but he admitted that he did not know for sure what it was and that LiDAR imagery and aerial photographs from the 1940s did not show that surface feature. The information Panno relied on from his field investigations largely came from areas outside of the proposed dairy site, and nothing was tied directly to the footprints of the waste holding ponds.

Panno further testified that water tests of the area well showed elevated levels of sodium chloride, which could indicate the susceptibility of the karst aquifer, but he admitted that similar levels of sodium chloride had been found in wells in non-karst areas. He also agreed that in karst areas there was a causal connection between septic systems and wells contaminated with bacteria, but he did not test the wells near the proposed dairy for bacteria, even though it would have been a "good idea." Notably, lay witness testimony indicated that the well water was currently potable, with no known bacterial contaminations. Panno also admittedly did not perform many tests for karst that he thought Bos should have done, such as measuring stream flow, performing groundwater chemistry evaluations, installing monitoring wells, and conducting dye tracing. He did not look at rock corings from the site even though he admitted that it would not have been costly and that he probably should have. Panno also acknowledged that a karst hydrologist performed a chemistry test from flowing water on the site but found no evidence of karstified carbonate bedrock. Panno agreed that the most appropriate way to determine the suitability of a site for a proposed use required a site-specific analysis, which he did not do here.

Plaintiffs also relied on the preliminary-injunction-hearing transcript of Lester Johnson's testimony, but that testimony also lacked in-depth site-specific considerations. Johnson opined that dye tracing was the best method for determining the presence of karst, and it is undisputed that plaintiffs did not do such a test here. C. Pius Weibel testified in rebuttal that weathered or highly weathered limestone was present in five of the rock corings and one of the borings, and the presence of such limestone at that depth meant that the bedrock was karstic. However, Panno contradicted this testimony when he stated that not all highly weathered limestone or fractured carbonate bedrock was karstified carbonate bedrock.

In addition to the types of sources relied on by plaintiffs' experts, Bos's expert Brett Naugle observed the actual rock coring process and analyzed the corings. He further lab-tested them and determined that the rock materials were not limestone. Bos's expert David Trainor also looked at the corings and considered information from the excavation of the ponds. Plaintiffs argue that Trainor testified, among other things, that: the soil borings showed different types of soil under the holding ponds; the drain systems were designed to drain into a stream that leads to the Apple River; and it is not prudent engineering practice to locate a manure pond on top of a stream. However, Trainor testified on redirect examination that although the soils from the borings were different, they were uniform because the material was clay and generally the same across the entire footprint. He also testified that the perimeter drain system was designed to carry liquid from where the water table broke out of the ground, rather than directly from the ponds themselves. Regarding an alleged stream on top of the waste holding pond, Terry Feldman testified that there was a tile-fed ditch[3] in the

---

[3]As we stated in an unpublished portion of this opinion, agricultural drain tile is sometimes used to allow rainwater to flow off of land. See McGoey v. Brace, 395 Ill. App. 3d 847, 852 (2009).

footprint of one of the containment ponds. He also testified that Bos had received permission to move the ditch, and when construction was completed, no portion of the ditch would remain in the pond's footprint.

At oral argument, plaintiffs argued that, geologically, karst is a regional concept and extends from the Mississippi River to Freeport. Plaintiffs maintained that when the legislature enacted the Livestock Act, it intended that additional safety precautions be taken in karst areas. According to plaintiffs, karst is not a site-specific concept, and drilling a few three-inch tubes into some portions of the site is not sufficient to verify the site's safety. Plaintiffs argued that Map 8 shows that all of Jo Daviess County is in a karst region and that therefore one has to build according to karst standards, including using steel for waste pond liners.

The very regulations that plaintiffs rely on defeat their argument here. The regulations refer to sinkhole areas on Map 8 as automatically requiring additional inspections and tests, rather than heightening requirements for everything in a "karst region" on Map 8, which would include all of Jo Daviess County. 35 Ill. Adm. Code §506.302(g) (Conway Greene CD-ROM June 2002). The proposed dairy is not in a sinkhole area on Map 8. The regulations also require additional inspections and tests if the soil sampling results "indicate the proposed livestock waste handling facility is to be located in a karst area." 35 Ill. Adm. Code §506.302(g) (Conway Greene CD-ROM June 2002). The reliance on limited sinkhole areas and site-specific sampling shows that the Department was not using large-scale regional designations to define karst areas. Even if it were, every livestock waste handling facility in a karst area does not necessarily have to be made of steel or concrete, as the owner or operator may seek to "modify" the standards if the modification protects the ground and surface water and the structural integrity of the waste facility. 35 Ill. Adm. Code §506.312(c), amended at

25 Ill. Reg. 14883, eff. November 15, 2001.  Notably, even Panno agreed that a site-specific analysis is the best way to determine a site's suitability for a proposed use.

In the end, the trial court was faced with testimony from credentialed, experienced experts who arrived at opposite conclusions as to whether there was evidence of karstified carbonate bedrock on the proposed dairy site.  As stated, it is the trier of fact's role to resolve conflicts in the evidence, assess witnesses' credibility, and determine the weight to be given to their testimony.  Prairie Eye Center, Ltd., 329 Ill. App. 3d at 298-99.  The record supports the trial court's finding that Bos's expert witnesses, unlike plaintiffs' expert witnesses, conducted more site-specific analysis in arriving at their conclusions that there was no evidence of karstified carbonate bedrock below the containment ponds.  Accordingly, we cannot say that the trial court's decision, that plaintiffs failed to show that there was a high probability of groundwater contamination and were not entitled to a permanent injunction on that basis, is against the manifest weight of the evidence.

Plaintiffs argue that there was evidence that toxic silage leachate has invaded and will continue to invade Steve Holesinger's property.  Holesinger testified that a stream from the proposed dairy's leachate containment pond entered the stream running through his property.  Huettl testified that silage leachate was overflowing from its containment pond area and creating an erosion gully.  However, plaintiffs' evidence on this issue was based purely on visual observation, and there was no testing to show that the alleged overflow contained silage leachate or if so, in what concentration.  Accordingly, the trial court's failure to find that plaintiffs had proven trespass from toxic silage leachate is not against the manifest weight of the evidence.

Plaintiffs also argue that Holesinger's residence is within 2,490 feet of the proposed dairy, contrary to the Livestock Act's minimum setback distance for an occupied residence.  To any extent

that the setback distances are arguably relevant to plaintiffs' nuisance claims, we address this issue. As stated, the construction of a statute is a question of law, which we review de novo. In re J.L., 236 Ill. 2d at 340. The primary rule of statutory construction is to give effect to the legislature's intent, which is best determined by the statutory language's plain and ordinary meaning. In re J.L., 236 Ill. 2d at 339. Under the Livestock Act, a livestock facility that has 50 or more but less than 1,000 animal units must maintain a minimum setback distance of one-quarter of a mile from the nearest occupied residence. 510 ILCS 77/35(c)(3) (West 2008). One mile is 5,280 feet (Webster's Third New International Dictionary 1433 (1986)), so one-quarter of a mile is 1,320 feet. For a livestock facility that has 1,000 or more but less than 7,000 animal units, the minimum setback for an occupied residence "shall be increased 220 feet over the minimum setback of ¼ mile for each additional 1,000 animal units over 1,000 animal units." 510 ILCS 77/35(c)(4)(B) (West 2008). In this case, Tradition South planned to have 6,850 animal units. This number consists of 5 "additional 1,000 animal units over 1,000 animal units," so the setback would be one-quarter of a mile (1,320 feet) plus 5 x 220 feet (1,100 feet). Thus, the total required setback from an occupied residence would be 2,420 feet, meaning that Holesinger does not live within the minimum setback distance.

We further conclude that the trial court's finding that plaintiffs did not prove prospective nuisance or trespass through individual plaintiffs' testimony about light, noise, traffic, and air pollution is also not against the manifest weight of the evidence. Plaintiffs expressed concerns about these issues but provided few, if any, facts to overcome their burden of proof. They also sought to introduce expert testimony through Doctors Gorelick and Netzel on harmful emissions that the dairy would emit, but the trial court sustained Bos's objection to their qualifications to offer such testimony, and we conclude that it did not abuse its discretion in doing so. Plaintiffs did testify about their

familiarity with cow odors from living on or near farms and/or owning cows themselves. In an agriculturally zoned area, homeowners should reasonably expect some odors consistent with agricultural operations. See Woods v. Khan, 95 Ill. App. 3d 1087, 1090 (1981). Still, agricultural smells can reach a point where they overwhelmingly interfere with homeowners' rights to enjoy their property. See Woods, 95 Ill. App. 3d at 1090. Here, plaintiffs' testimony regarding odors was based on small-scale dairies and did not take into account the manner in which Bos planned to process the animal waste, including use of an anaerobic digester[4] and holding ponds, or Bos's odor control plan, which included planting trees. Accordingly, the trial court's denial of an injunction based on odors was also not against the manifest weight of the evidence.

E. Bos's Appeal

We now move on to Bos's appeal, which has been consolidated with plaintiffs' appeal. Bos argues that the trial court erred in denying his motion to dissolve the preliminary injunction halting construction of Tradition South. Bos argues that he is therefore entitled to damages under section 11--110 of the Code (735 ILCS 5/11--110 (West 2008)), which allows the court to assess damages for the wrongful issuance of a temporary restraining order or a preliminary injunction. Bos argues that the trial court should have granted his motion because plaintiffs grossly overstated their case at the preliminary stages, withheld exculpatory evidence from the trial court, "and successfully maintained their charade until *** Bos could undo it through discovery, the use of the Freedom of Information Act, and cross-examination at trial." Bos argues that the true issue on appeal is not

---

[4]As stated in an unpublished portion of this opinion, an anaerobic digester is an airless tank in which bacteria break down organic waste, such as manure, and produce methane as a byproduct. See Joseph Oat Holdings, Inc. v. RCM Digesters, Inc., 665 F. Supp. 2d 448, 451 n.2 (D.N.J. 2009).

whether the trial court itself erred in making its underlying rulings, but rather whether plaintiffs should bear the costs associated with their conduct.

Before addressing the merits of Bos's appeal, we consider plaintiffs' motion to dismiss, which we ordered taken with this case. Plaintiffs argue that we should dismiss Bos's appeal pursuant to the Citizen Participation Act (Act) (735 ILCS 110/1 et seq. (West 2008)). The purpose of the Act is to counter " 'Strategic Lawsuits Against Public Participation' " (SLAPPs), which have been used "as a means of intimidating, harassing, or punishing citizens and organizations for involving themselves in public affairs." 735 ILCS 110/5 (West 2008). The Act's purpose is to eliminate SLAPPs and protect citizen participation in public affairs by: (1) immunizing individuals from lawsuits based on acts taken in furtherance of their rights to free speech and to petition government; (2) creating an accelerated legal process to dispose of SLAPPs; and (3) providing attorney fees and costs to parties who prevail on motions under the Act. Wright Development Group, LLC v. Walsh, No. 109463, slip op. at 9-10 (October 21, 2010).

Bos argues, among other things, that: (1) plaintiffs forfeited any reliance on the Act because they did not raise the issue in the trial court, and (2) the Act does not allow plaintiffs to initiate such a motion in the appellate court. We agree. Generally, a party who does not raise an issue in the trial court forfeits the issue and may not raise it for the first time on appeal. In re Marriage of Culp, 399 Ill. App. 3d 542, 550 (2010); see also Enterprise Recovery Systems, Inc. v. Salmeron, 401 Ill. App. 3d 65, 76 (2010) (motion under the Act was an affirmative defense, and the defendant could not raise the defense in the trial court after judgment was entered). Moreover, the Act does not contemplate a party bringing the motion for the first time on appeal. The Act refers to discovery and a hearing and decision on the motion within 90 days, as well as to a clear and convincing standard for ruling

on the motion. 735 ILCS 110/20 (West 2008). These procedural mechanisms and the evidentiary standard clearly pertain to the trial court rather than the appellate court. See Koffski v. Village of North Barrington, 241 Ill. App. 3d 479, 483 (1993) (a party "should not be permitted to utilize a procedural mechanism enacted by the legislature and designed for use in the trial court as a means to obtain the dismissal of an appeal"). Accordingly, we deny plaintiffs' motion to dismiss.

Plaintiffs further argue that we lack jurisdiction over Bos's appeal because Bos did not timely file a notice of appeal. Bos filed the motion to dissolve the preliminary injunction on February 6, 2009, and he filed a supporting memorandum on October 16, 2009. The trial court denied Bos's motion to dissolve the preliminary injunction on November 10, 2009, and Bos filed a notice of interlocutory appeal on December 10, 2009, within the 30-day period required under Supreme Court Rule 307(a) (Official Reports Advance Sheet No. 7 (April 8, 2009), R. 307(a), eff. March 20, 2009). Plaintiffs base their jurisdictional argument on responses Bos filed in November and December 2008 to motions filed by two separate groups of former individual plaintiffs who sought to voluntarily dismiss themselves from the case. Bos objected to the dismissal of those plaintiffs on the ground that he would otherwise have a statutory right to damages against them if the preliminary injunction were later dissolved.[5] He also argued that voluntary dismissal would constitute an automatic dissolution of the preliminary injunction. In his prayers for relief, Bos requested that if the trial court granted the motions for voluntary dismissal, it also dissolve the preliminary injunction and award him damages. Because the trial court granted the motions for voluntary dismissal, plaintiffs argue that the trial court

---

[5]In a memorandum in support of a request for bond, Bos asserted damages of $15,000 to $16,000 per day in lost sales; $1.2 million from prepurchased animal feed; and demobilization costs of over $20,000.

implicitly denied Bos's requests to dissolve the preliminary injunction and that the denial was appealable at that time.

Plaintiffs' argument is without merit. Bos's 2008 requests to dissolve the preliminary injunction were made in response to motions for voluntary dismissal filed by individual plaintiffs, and the trial court granted the motions without comment on whether Bos was entitled to dissolution of the preliminary injunction. Accordingly, Bos could not have sought review of the issue at that time. Rather, he appropriately and timely appealed from the trial court's November 2009 order explicitly denying his actual motion to dissolve the preliminary injunction.

Plaintiffs also argue that Bos's appeal is moot because the ruling on the preliminary injunction merged into the ruling on the permanent injunction, and the preliminary injunction can no longer be dissolved. See Keefe-Shea Joint Venture v. City of Evanston, 364 Ill. App. 3d 48, 60 (2005) ("[a]n interlocutory injunction becomes functus officio when the case is disposed of on the merits"); Puleo v. McGladrey & Pullen, 315 Ill. App. 3d 1041, 1044 (2000) (preliminary injunctions are limited in duration and do not extend beyond the conclusion of the action). "An appeal is considered moot where it presents no actual controversy or where the issues involved in the trial court no longer exist because intervening events have rendered it impossible for the reviewing court to grant effectual relief to the complaining party." In re J.T., 221 Ill. 2d 338, 349-50 (2006).

Here, Bos filed a motion to dissolve the preliminary injunction because, among other things, he sought to obtain damages under section 11--110. Such damages may be obtained only if the trial court dissolves the preliminary injunction before the case is disposed of on the merits (735 ILCS 5/11--110 (West 2008)) and determines that it was wrongfully issued (Rochester Buckhart Action Group v. Young, 394 Ill. App. 3d 773, 776-77 (2009)). The trial court denied Bos's motion to

dissolve on November 10, 2009, before its December 15, 2009, final judgment denying the permanent injunction on the merits. Under Rule 307(a)(1), Bos could appeal as a matter of right from the order refusing to dissolve the preliminary injunction. Official Reports Advance Sheet No. 7 (April 8, 2009), R. 307(a)(1), eff. March 20, 2009. If Bos had not timely appealed from that order, the order would constitute a final order that the preliminary injunction was properly granted and become the law of the case. See Stocker Hinge Manufacturing Co. v. Darnel Industries, Inc., 94 Ill. 2d 535, 544 (1983); Pasquinelli v. Village of Mundelein, 257 Ill. App. 3d 1057, 1068 (1994). However, Bos appealed on December 10, 2009, within 30 days of the trial court's denial of his motion to dissolve. Thus, Bos preserved his right to contest the trial court's ruling. See Rochester Buckhart Action Group, 394 Ill. App. 3d at 779.

We now turn to the question of whether the trial court erred by denying Bos's motion to dissolve. A preliminary injunction serves to preserve the status quo until the case's merits have been decided. Ziller v. Rossi, 395 Ill. App. 3d 130, 139 (2009). A plaintiff seeking a preliminary injunction must show: (1) a clear right or interest needing protection; (2) no adequate remedy at law; (3) that irreparable harm will occur without the injunction; and (4) a reasonable likelihood of success on the merits of the underlying action. Ziller, 395 Ill. App. 3d at 139. The plaintiff does not carry the same burden of proof as is required to prevail on the ultimate issue, but rather must make a prima facie case that there is a fair question about the existence of the claimed right and that circumstances reasonably indicate that the plaintiff will be entitled to relief on the merits. Ziller, 395 Ill. App. 3d at 139.

Section 11--108 of the Code allows a party to move to dissolve a preliminary injunction. That section provides: "A motion to dissolve an injunction may be made at any time before or after answer

is filed. Upon a motion to dissolve an injunction after answer is filed the court shall decide the motion upon the weight of the evidence." 735 ILCS 5/11--108 (West 2008). Whether to dissolve a preliminary injunction is within the trial court's discretion. Stoller v. Village of Northbrook, 162 Ill. App. 3d 1001, 1008 (1987); see also Ford Motor Credit Co. v. Cornfield, 395 Ill. App. 3d 896, 903 (2009) ("In interlocutory appeals, the trial court's decision to grant or deny the relief requested is generally reviewed under an abuse of discretion standard"). To dissolve a preliminary injunction, the defendant must show that the trial court abused its discretion in issuing the injunction because the plaintiff did not present a fair question as to the legal rights involved. Ziller, 395 Ill. App. 3d at 140. The ultimate grant or denial of the permanent injunction does not dictate whether the preliminary injunction should have been dissolved. That is, a preliminary injunction may have been wrongfully issued even if the plaintiff successfully obtains a permanent injunction, and, conversely, a preliminary injunction may rightfully have been issued even if the permanent injunction is denied. Schien v. City of Virden, 5 Ill. 2d 494, 503 (1955). A trial court possesses the inherent authority to review, modify, or vacate an interlocutory order at any time until it enters a final judgment. Doe v. Department of Professional Regulation, 341 Ill. App. 3d 1053, 1059 (2003).

In ruling on the motion to dissolve, the trial court stated as follows in relevant part. It entered the preliminary injunction after the parties had presented a significant amount of evidence, albeit when little discovery had been conducted by the parties. Bos's arguments that Panno did not conduct every test available to him, that his methodology was flawed, and that his ultimate opinion was sheer speculation were issues to be resolved at trial, and the preliminary injunction was issued to maintain the status quo until that point.

On appeal, Bos argues that the motion to dissolve should have been granted based on e-mails that Bos obtained showing that, during the preliminary injunction stage, Panno withheld evidence about precise scientific methods to test for karst and falsely passed himself off as an objective witness when he was actively colluding with HOMES and its members to overstate their case. More specifically, Bos argues that e-mails show that Panno did not conduct any ground-penetrating-radar or low-frequency-radar testing on the dairy site despite his discussions of such tests with colleagues in e-mails and "the availability of discovery tools and months of opportunity to do so." Panno similarly did not install test wells or use tracers. Bos also notes that Panno had an e-mail exchange with Weibel about a test to determine whether there was a "gaining" or "losing" stream to show evidence of karst, but Panno never performed such a test. E-mails also showed that Panno was aware of Eric Peterson's tests finding that nothing in the water samples definitively identified the area as karst. Bos further argues that Panno's visits to the area and the site proved that he was not objective, in that his property inspections were arranged through HOMES and the organization directed him to various places where there was allegedly evidence of karst.

Bos additionally argues that even if the trial court found the foregoing information insufficient, evidence at trial "shed a new light on HOMES and Panno." Bos references Panno's admission that he received potential trial questions and answers from HOMES's leader Matthew Alschuler. Also, Bos argues that although Panno, a senior scientist for the Illinois State Geological Survey, stated that he had been asked to get involved in the case by the Attorney General's office, Panno agreed that the office later determined that it should not be involved in the case, a fact he did not mention in his reports. Bos recites the full range of testimony brought out on Panno's cross-examination, including: that his research showed that there was a relationship between bacterial contamination from septic

systems and the existence of karst, but he did not test any of the wells around the proposed dairy for such contamination; that he was aware of many tests for karst that he did not conduct; that he had experience with a clay pond liner that did not achieve breakthrough after 14 years; that he had worked with Alschuler to gather physical evidence; and that he did not have direct evidence of karstified carbonate bedrock under the containment ponds. Bos argues that Panno should have disclosed all of these things to the trial court during the preliminary injunction proceedings and after the entry of the preliminary injunction, but that he did not. Bos argues that the trial court's ruling denying the permanent injunction shows that HOMES and Panno had no real basis to support their claims, and Bos argues that he is entitled to damages.

We conclude that the trial court did not abuse its discretion in denying Bos's motion to dissolve the preliminary injunction. While Panno admitted at trial that various tests could be done to indicate the presence of karst, he also testified that the Geological Survey had very little resources to spend, to the extent that staff would drive 10 hours round trip and do 10 hours of fieldwork in one day because there was no money to stay overnight in a hotel. When asked why he did not get funding from plaintiffs for tests, Panno replied that it was "not something we do." Thus, while there was certainly communication occurring between Panno and plaintiffs, the fact that Panno did not ask them to pay for tests shows a degree of independence not acknowledged by Bos. Further, Panno testified that although he received a list of potential questions and answers from Alschuler, he had not "used" it for anything. When asked why he did not tell Alschuler to stop contacting him, Panno replied that he was a public servant and was supposed to respond to e-mails and phone calls. When asked if he thought the communication might create the appearance of impropriety, Panno testified that he was not a lawyer and that this was his first involvement with litigation regarding his work. Panno also

testified that Bos never invited him to inspect the farm or offered any testing equipment. Panno's explanations are reasonable and are not contradicted by the record.

Panno further testified that the Board had asked him to write a report on the site and that the Attorney General's office then requested that he write a more extensive report. Contrary to Bos's argument, Panno's reports and testimony did not imply that he was involved on behalf of the Attorney General's office, but rather explained how he became involved in the case. Panno never claimed at the preliminary injunction hearing that he had utilized all possible methods to determine the presence of karst, but rather he offered an opinion based on the evidence he had that he felt was reliable. As stated, plaintiffs were not required to prove their case at the preliminary injunction stage but rather needed only to present a "fair question" as to the legal rights involved. Ziller, 395 Ill. App. 3d at 140. At trial, Panno testified that while there was no direct evidence of karstified carbonate bedrock beneath the site, there was a lot of indirect evidence leading to that conclusion. Panno was clearly a karst expert who had authored numerous articles on the subject, and weaknesses in his opinion that the dairy site was underlain by karst were brought out in cross-examination. The fact that Bos ultimately prevailed does not mean that Panno's opinion was baseless, and the trial court acted within its discretion in denying Bos's motion to dissolve the preliminary injunction.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Jo Daviess County.

Affirmed.

O'MALLEY and HUDSON, JJ., concur.