2025 IL App (1st) 241242-U

No. 1-24-1242

First Division
April 21, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

---

| | | |
|---|---|---|
| CROSBY THEODORE, LLC, an Illinois limited liability company, | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 2023 CH 06295 |
| CITY OF EVANSTON, an Illinois municipal corporation, | ) ) ) | Honorable Cecilia A. Horan |
| Defendant-Appellee. | ) | Judge, presiding. |

---

JUSTICE COBBS delivered the judgment of the court.
Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*: Circuit court properly denied plaintiff-appellant's motion for preliminary injunction.

¶ 2    This case concerns a property owner's disagreement with the City of Evanston's decision to sell a vacant city lot to a non-profit affordable housing developer and an established church next to the owner's historical building. Following years of proposals, negotiations, and City Council hearings that ultimately approved the sale, plaintiff-appellant, Crosby Theodore LLC, filed a multi-

count complaint for injunctive relief and damages against defendant-appellee, the City of Evanston (City), defendant Mount Pisgah Ministry, Inc. (Mt. Pisgah), a church, and defendant Housing Opportunity Development Corporation (HODC), a non-profit affordable housing developer. Plaintiff subsequently moved for a preliminary injunction to enjoin enforcement of all city ordinances and resolutions effectuating the sale and property development. Following a three-day hearing, the circuit court denied plaintiff's motion. Plaintiff now appeals, arguing that the circuit court erred in a multitude of ways when it denied its motion. For the following reasons, we affirm.

¶ 3                                          I. BACKGROUND

¶ 4                                  A. Events Prior to Litigation

¶ 5      The following facts are derived from the record on appeal, which includes plaintiff's first amended complaint and the parties' filings regarding the motion for preliminary injunction.

¶ 6                                          1. *The Corner Lot*

¶ 7      The City, an Illinois municipal corporation and home rule unit of government, owns three vacant parcels of land, located at 1805 Church Street, 1708 Darrow Avenue, and 1710 Darrow Avenue in Evanston, Illinois (collectively, the Corner Lot). One of the parcels, 1805 Church, was previously the site of a gas station and underground fuel storage tanks owned by Chevron. At some point, the gas station left the premises and the tanks were removed. However, Chevron installed an engineered asphalt barrier which was placed over what was found to be contaminated soil.

¶ 8      At some point in 2015, the Illinois Environmental Protection Agency (IEPA) became involved with the Corner Lot to remediate 1801 and 1805 Church Street for future use. In accordance with the Illinois Environmental Protection Act, the IEPA granted the City's request for "no further remediation" subject to certain conditions pursuant to a November 6, 2017, letter (the first Remediation Letter). The first Remediation Letter indicated that it constituted "prima facie

evidence" that the site "[did] not constitute a threat to human health and the environment" so long as the controls and conditions delineated in the letter were followed. Notably, the first Remediation Letter restricted the site to industrial and commercial use, but noted that the designated use could be revised if further investigation or remedial action was conducted to make the land appropriate. The letter also provided for specific controls and safety mechanisms for future use. Notably, the letter directed that the asphalt barrier was to remain and be maintained over the contaminated soils as a barrier to prevent inhalation. The letter also indicated that any future use must include the installation of a full concrete slab or basement floor. Additionally, the letter advised that a safety plan for any excavation and construction activities should be developed to avoid possible worker exposure to the contaminated soil.

¶ 9     On March 8, 2018, and reissued on June 7, 2018, the IEPA published a second Remediation Letter which granted the City's request for a second "no further remediation" determination. Relevant here, it provided that the site was now approved for residential, commercial, and industrial use. The second letter maintained past engineering controls, including the maintenance of the asphalt barrier, building a concrete basement floor, and safety plans for worker exposure.

¶ 10                    2. *Requests for Development Proposals*

¶ 11     On July 29, 2019, and October 9, 2019, Evanston's Fifth Ward held community meetings discussing potential development ideas for the Corner Lot.

¶ 12     On January 14, 2020, the City issued a request for proposals (RFP) for the redevelopment of the Corner Lot. It also created a website detailing proposal requirements and sought all responses to be submitted by March 2, 2020, with selection to occur either in June or July 2020. All proposals were to be reviewed by the City's Community Development Department, the Public Works Agency, the City Manager's Office, the Economic Development Committee, and the City

Council. The City's desired use for the area was a three-story mixed-use building with an active ground floor for retail, or an "iconic [two-story] building" for religious, community, or cultural use. City staff also recommended a mixed-use building with commercial use on the first floor.

¶ 13     The RFP noted that the Corner Lot was adjacent to a vacant lot owned by Mt. Pisgah Ministry, a church. Applicants were "highly encouraged" to determine if they could partner with the church in redevelopment. Proposals would be considered based on, among other things, "past development success" and "experience in working with municipalities of similar scale as Evanston."

¶ 14     Finally, the RFP referenced and attached the second Remediation Letter.[1] Therein, the RFP advised developers of the asphalt barrier's existence which had to be maintained over the contaminated soils, that any future building had to include plans for a concrete slab or basement floor, and that any future developer was obligated to comply with the other conditions delineated within the letter.

¶ 15                    3. *Solicitation and Received Proposals*

¶ 16     Plaintiff, Crosby Theodore LLC, is an Illinois limited liability company that owns a building located at 1817 Church Street in Evanston. Plaintiff's property is designated as an Evanston Historic Landmark building and is currently leased to one commercial tenant, Jackson LLP, a law firm. Following the release of the RFP, on August 16, 2021, plaintiff sent a letter to the City Council expressing interest in developing the Corner Lot.

---

[1]The RFP incorrectly listed the second Remediation Letter's year of publication as 2019.

¶ 17    Defendant Mt. Pisgah[2] operates a church at 1815 Church Street in Evanston, which is eastward adjacent to plaintiff's location. As noted in the RFP, Mt. Pisgah also owns a vacant lot directly east of its building, located at 1813 Church Street (collectively, the Pisgah Parcels). Sometime in 2020, Mt. Pisgah submitted a proposal to develop the Corner Lot.

¶ 18    Defendant HODC is an Illinois not-for-profit corporation that develops affordable housing in Chicago's north suburbs. Defendant, Richard Koenig, is an Illinois resident and president of HODC. On March 2, 2020, HODC also submitted a proposal to develop the Corner Lot.

¶ 19                    4. *Negotiations and Memorandum of Understanding*

¶ 20    Following receipt of proposals, City staff recommended that HODC be awarded the bid. However, following later negotiations between HODC and Mt. Pisgah, the two agreed to partner in the overall redevelopment. As such, on December 1, 2020, Mt. Pisgah and HODC entered into a "Memorandum of Understanding" (MOU), which memorialized a plan to jointly procure and develop the Corner Lot. The MOU stated that Mt. Pisgah was to construct a new multi-million-dollar church on the Corner Lot with HODC as the lead developer. The City's Economic Development Committee subsequently selected the joint project on December 2, 2020.

¶ 21    At some point, the parties discussed a "land swap," in which HODC's proposed taller building on the Corner Lot would instead be moved and occupy the middle of the block, and Mt. Pisgah would build its new church on the Corner Lot. The "land swap" plan required a partial land exchange between the two entities and the City, where Mt. Pisgah would own land 75 feet east of

---

[2]Plaintiff noted in the complaint that it could not locate an Illinois corporation by the name of "Mt. Pisgah Ministry, Inc.," in the Illinois Secretary of State's Department of Business Services database, despite the entity using this name in various legal submissions.

the Corner Lot and HODC would own the remainder of the area between plaintiff's property and Mt. Pisgah's development.

¶ 22    On June 30, 2021, Mt. Pisgah and HODC entered into the "1811-1815 and 1805 Church Street Development Agreement." The agreement delineated the parties' intention to create a church, an affordable housing project, retail space, and parking. Mt. Pisgah further agreed to donate to HODC the land necessary to develop the housing project, with the parties' arrangement contingent on the City selling 1805 Church to Mt. Pisgah.

¶ 23                    5. *Ordinance 4-O-21*

¶ 24    On February 8, 2021, the City Council introduced "Ordinance 4-O-21," which formalized its notice of intent to sell the Corner Lot. The ordinance stated that notice of the sale had been published on January 14, 2021, in the Evanston Review, a local newspaper. The ordinance was approved on February 11, 2021.

¶ 25                    6. *Special Use Permits and Variation Requests*

¶ 26    On July 14, 2022, Mt. Pisgah submitted a variance application for 1801-1805 Church Street and 1708-1710 Darrow Avenue. The proposed project was described as a new three-story church with leased off-site parking on its vacant lot.

¶ 27    On July 15, 2022, HODC submitted a variance application for 1811-1815 Church Street with Mt. Pisgah listed as the property owner. The variance application sought approval to demolish Mt. Pisgah's existing church and to construct a five-story mixed use building with 44 units, two ground floor retail spaces, and enclosed ground floor and underground parking. The application stated that the project would result in "increased impervious surface coverage," which would help control stormwater.

¶ 28                    7. *Land Use Commission Hearings*

¶ 29    On January 11, 2023, HODC and Mt. Pisgah presented their requests to the Evanston Land Use Commission (LUC), a public body that recommends approval or rejection of land use requests to the City Council. Plaintiff appeared at the hearing, and alleging no notice of the meeting, requested a three-month continuance to review the requests. The LUC continued the meeting to February 8, 2023.

¶ 30    On February 8, 2023, the LUC reconvened. Koenig testified, and plaintiff presented written and oral testimony. The meeting was further continued to February 22, 2023.

¶ 31    On February 22, 2023, the LUC convened again and recommended approval to the City Council as to HODC's requested variances. However, the LUC did not recommend approval for Mt. Pisgah's requests.

¶ 32    On March 13, 2023, the City Council's Planning and Development Committee held a hearing on Mt. Pisgah's request. It considered the LUC's negative recommendation but nonetheless recommended approval to the City Council.

¶ 33                    *8. Ordinance 35-O-23 (HODC)*

¶ 34    On March 13, 2023, the City Council introduced "Ordinance 35-O-23," which formally adopted HODC's variation request. The ordinance recounted HODC's notice and publication timeline, including its notice of the request in the Evanston Review, as well as through written signage and mailed notice to all property owners within 500 feet of the property. The ordinance also indicated that HODC's variation was subject to a few amendments, including a reduction in the building's height and its dwelling units. Amongst other requirements, HODC was also required to work with the City's Preservation Commission prior to demolition, where the parties would review the construction management plan and work with a structural engineer to prevent any damage to plaintiff's property. HODC was also ordered to ensure that its development plan

complied with the City's floodplain regulations and ordinances concerning watershed management prior to the issuance of any building permits. Finally, prior to permit issuance, HODC was required to share its construction management plan with plaintiff. The ordinance was approved and adopted on April 10 and April 11, 2023.

¶ 35                           *9. Ordinance 34-0-23 (Mt. Pisgah)*

¶ 36    On March 13, 2023, the City Council introduced "Ordinance 34-O-23," which formally approved Mt. Pisgah's special use and variation request. Therein, the ordinance recounted a similar notice and hearing timeline. On April 11, 2023, the ordinance was approved by the City with certain conditions, including creating a management plan to coordinate construction with the proposed HODC project. The ordinance also provided that any excavation of the contaminated soil was to comply with federal, state, and local environmental protections.

¶ 37                     *10. Ordinance 51-O-23 and Resolution 22-R-23*

¶ 38    On June 26, 2023, Ordinance "51-O-23" was introduced to authorize the sale of the Corner Lot. Therein, the City approved funding for construction of HODC's building for $4 million, including a $2 million developer fee, with a majority of funds to be paid through grants, public funds, and tax credits. The ordinance recounted that it had provided notice of the sale in the Evanston Review. That same day, the City Council also introduced "Resolution 22-R-23," which approved two property survey plats for subdivisions 1801-1815 Church Street and 1708-1710 Darrow Avenue. Both were approved on July 10, 2023.

¶ 39                              B. Court Proceedings

¶ 40                                 1. Complaint

¶ 41    On July 6, 2023, plaintiff filed a multi-count complaint and jury demand in the circuit court of Cook County naming as defendants HODC, Koenig, Mt. Pisgah, and the City. The complaint

was amended on February 26, 2024. Generally, plaintiff alleged that the overall RFP and process approving the various ordinances and resolutions had lacked in transparency, had failed to consider the objections and concerns of legal stakeholders, had failed to adhere to establishing variation procedures, and had failed to protect its residents from environmental hazards.[3]

¶ 42                                2. Motion for Temporary Restraining Order[4]

¶ 43    On July 11, 2023, plaintiff filed its motion for temporary restraining order against all defendants, seeking to enjoin the City from enforcing its various ordinances and initiating the transactions with Mt. Pisgah and HODC. We summarize the substance of plaintiff's motion and defendants' responses below.

¶ 44    Plaintiff argued that, as an adjacent property owner, it had a protectible interest, and that the City had violated both its substantive and procedural due process rights by failing to give proper notice of the underlying zoning proceedings or considering the new development's negative effects to its property. Additionally, plaintiff argued it would suffer imminent and irreparable harm upon demolition because, among other things: (1) it owned a one-hundred-year-old historic property that was at risk for structural damage which HODC and Mt. Pisgah could not likely repair, (2) demolition and construction would cause air, water, and sound pollution, potentially harm its buildings, release contaminants, and cause financial expense in the event relocation of its building occupants became necessary; and (3) the project failed to demonstrate adequate stormwater management.

---

[3]The amended complaint included nine separate claims against the City and eight various claims against defendants Koening, HODC and Mt. Pisgah, collectively.

[4]A footnote in the circuit court briefing indicates that, by agreed order, plaintiff's motion for temporary restraining order was treated as a motion for preliminary injunction.

¶ 45    Regarding an inadequate remedy at law, plaintiff argued that damage to its property could not be quantified or recouped through monetary damages and that any reinstallation of the engineered environmental barrier around the contaminated soils would also be difficult, "if not impossible to undo or quantify." Further, plaintiff asserted that the City's "nontransparent" RFP process had failed to provide plaintiff with legally sufficient notice. Thus, plaintiff argued it was likely to succeed on the merits. Finally, plaintiff argued that the balance of hardships and the public interest favored its position because any damage from the proposed development was "irreversible" in nature and further, the public interest weighed heavily in maintaining the current church while the matter was adjudicated.

¶ 46    In its response, the City characterized plaintiff's motion and unverified complaint as conjecture and insufficient to stop a duly enacted legislative determination. Citing its home rule powers, the City argued that plaintiff had no basis in law that would prevent it from exercising its powers. Further, the City continued, plaintiff had neither standing nor a protectible property interest to challenge the sale of the land under either the City code or the various ordinances and resolutions. The City refuted plaintiff's claim of irreparable harm, noting that plaintiff had failed to provide any evidence as to real or imminent property damage. The City noted that plaintiff ignored the safeguards outlined in the various ordinances to ensure that such harms would not occur, which included a construction management plan, collaboration with the Preservation Committee, and performance standards for stormwater management and soil removal.

¶ 47    The City also rejected plaintiff's claim of an inadequate remedy at law, asserting the availability of money damages in the event that defendants caused damage to plaintiff's property. Additionally, the City argued that plaintiff could not succeed on the merits because, as a home-rule entity, the City's decision to sell the land was entitled to judicial deference and its zoning-

based ordinances carried presumptions of validity. Finally, the City argued that the potential loss of funding for the project tipped the balance of hardships against issuing the injunction. The City noted that its RFP and zoning procedures had produced a legislative decision that was in the City's best interest, which also had provided safety mechanisms for plaintiff and others during construction.

¶ 48    Defendants Koenig and HODC (collectively, HODC) also filed a response supported by Koenig's affidavit and therein noted that the circuit court had "recognized HODC's standing to oppose [p]lainitff's motion[.]" Relevant here, HODC argued that plaintiff had failed to show irreparable harm by failing to allege any facts demonstrating that: any aspect of HODC's construction plans would lead to disturbance of the contaminated soil or that Mt. Pisgah would deviate from any of the IEPA's mandated requirements; the conditions set forth in the various ordinances were insufficient to protect plaintiff and others; plaintiff had failed to allege how the construction plans would damage its building; or HODC or the City would fail to comply with Ordinance 35-O-23's requirements to collaborate with the Preservation Commission or ensure that the water management plan would comply with applicable restrictions prior to the issuance of building permits. Further, HODC observed, it was plaintiff that actually remained the biggest obstacle to the project, as it had refused to provide information to HODC regarding the depth of its basement so HODC's contractors could design the depth of its own to match harmoniously.

¶ 49                                3. Hearing

¶ 50    A hearing on plaintiff's motion for preliminary injunction was held over three days, beginning on February 7, 2024, and concluding on March 15, 2024. Multiple witnesses testified, however, we recite only the testimony necessary for our disposition.[5]

¶ 51                                    a. Erin Jackson

¶ 52    Jackson testified on behalf of plaintiff. On direct examination, she identified herself as the corporate representative for plaintiff and that she owned the property at 1817 Church Street, which was within 500 feet of the property at issue. Plaintiff's sole tenant was Jackson LLP, a law firm which occupied the entirety of the property. She had extensively restored the historical building, including the property floor after the building suffered stormwater damage.

¶ 53    Jackson first became aware of the City's RFP in 2020 and would check the City's website for updates. She believed the RFP process had been paused due to the COVID-19 pandemic. At some point, Jackson sent a letter to the City in which she expressed an interest in developing affordable housing on the Corner Lot. She did not receive a formal response but was later advised by her city council representative that the "lot had been spoken for" by Mt. Pisgah and HODC. She did not pursue the RFP any further.

¶ 54    Around Christmas 2022, Jackson learned that the Corner Lot's redevelopment was moving forward when she saw in the mail an announcement of a community meeting at Mt. Pisgah regarding the project. She denied receiving any notice otherwise. She also denied receiving any notice of future LUC meetings but admitted attending the initial and continued hearings in person or virtually.

---

[5]Other witnesses included: (1) Clare Kelly, City Council member for the First Ward of Evanston, called by plaintiff, and (2) Michael Griffith, a planner at the City, and called by the City. We also note that plaintiff raised repeated objections to HODC and Mt. Pisgah's standing to participate in the hearing, which were overruled by the court.

¶ 55    On January 11, 2023, Jackson attended the first LUC meeting on HODC and Mt. Pisgah's variance applications. Jackson was "alarm[ed]" as to the amount and number of requested variations, in light of various water issues at her own property. As of that date, she had not been provided any water management studies to mitigate her concerns.

¶ 56    Jackson also had environmental concerns, which were based on the 2017 Remediation Letter. She wished to provide a safe work environment for her employees and to protect the structural integrity of her property. She wanted to see environmental studies to ensure such safety regarding the contaminants in the soil but had been provided no assurances otherwise.

¶ 57    Jackson admitted that Ordinance 35-O-23 granting HODC's request contained conditions which addressed her concerns, such as construction management. She did not believe construction permits had been issued to HODC. HODC had never provided her copies of its plan, and she believed that the ordinance served as a mandate to involve her or to have information shared with her. She had also learned that HODC had met with the Preservation Commission and that they had made some recommendations to the construction management plan. She did not believe the enforcement mechanisms in the ordinance "had teeth" and felt the management plan was a "template." She was also concerned about HODC's financial reserves for the project in case anything went wrong.

¶ 58    On cross-examination, Jackson admitted that Ordinance 35-O-23 added conditions based on her stated concerns, including HODC working with the Preservation Commission and ensuring the construction plan complied with floodplain regulations. She also admitted to seeing HODC's construction plans that would manage stormwater release. She denied being invited by HODC to meet with the company and its architects to discuss her stormwater management concerns, but noted that she had been advised not to do so once this litigation had begun. When asked if she

believed that the City was incapable of enforcing its requirements against HODC, she responded, "[w]e were not given a report or evaluation or study or anything like that." She feared potential property damage based on her belief that HODC would not comply based on purported past noncompliance at other properties in Evanston. When asked about the basis of her fear on this particular project, she responded that she had not been provided with any engineering study to prove otherwise and that it was "not [her] burden at this juncture." She agreed that a neighbor did not have a "veto" over building and permitting plans of another property.

¶ 59     Jackson admitted that Ordinance 34-O-23 addressing Mt. Pisgah's request contained conditions for construction management, excavation of contaminated soils, and parking. Jackson testified that she had been made aware of the various IEPA remediation letters based on the RFP's references to them. She admitted that the second Remediation Letter expressly stated that the site had been approved for residential, industrial, and commercial use. However, she viewed the conditions and restrictions listed therein as controls for workers and not for adjacent property owners. She did not have any other evidence beyond the first Remediation Letter to justify her concerns. Jackson admitted that the current version of her complaint was "unintentional[ly]" incorrect as it had only relied on the first Remediation Letter issued in 2017, and that she had only found the 2018 version afterwards.

¶ 60     When asked if she had any evidence that Mt. Pisgah intended to disregard the issued conditions or that the City would fail to enforce them, she responded that discovery in the case had not yet begun and that no evidence had been provided otherwise. She admitted that the City could not issue a permit to Mt. Pisgah without compliance, but still believed the City would issue one because the project "ha[d] been pushed through" and that there were "a lot of environmental concerns that were sidelined during [the] process." She admitted to having no evidence that the

City would issue permits without compliance, or that Mt. Pisgah would use unlicensed or uninsured contractors. She felt that the conditions were "vague and broad," that she was generally unaware of the project's development, and that her fears were grounded in "lack of information, lack of detail, lack of data, lack of scientific studies, [and] candor." She indicated that the basis for the suit was to "gather that information and prevent imminent harm to [her] staff and building."

¶ 61    On redirect examination, Jackson testified that her concerns about pollution were "imminent" because once permits were issued, she would not be able to "undo potential and feared damage," and that she was "faced with so little evidence" that "defendants [were] going to protect" her property, her employees, and her community at large.

¶ 62                                    b. Richard Koenig

¶ 63    Koenig testified on behalf of defendants. On direct examination, he testified that building permits had not yet been issued for the current project. He had been aware of the environmental controls laid out in the Second Remediation Letter, including rules regarding soil excavation and removal. HODC also conducted soil testing on the Corner Lot that did not identify any contaminants that exceeded IEPA levels. If there had been a restriction against residential usage on the property, HODC would not have submitted a bid.

¶ 64    In accordance with the conditions set forth within the applicable ordinance, HODC had met with and submitted a construction management plan to the Preservation Committee in January 2024. The plan addressed stormwater concerns by including underground stormwater vaults that would collect water and release it slowly. The Commission had reviewed the plan and gave recommendations with no further involvement. Koenig further testified that plaintiff had refused to meet with him, HODC, and its architects regarding certain aspects of plaintiff's building, such as the depth of its basement to match HODC's construction.

¶ 65                            2. Circuit Court Ruling

¶ 66    On May 14, 2024, the circuit court issued a written ruling denying plaintiff's motion for preliminary injunction.[6] Notably, the circuit court indicated that plaintiff had failed to meet its burden on its motion as it failed to demonstrate that it "has or is likely to suffer the harm" it feared, and had failed to "prove there is a fair question the danger of harm is real and imminent[.]"

¶ 67    On June 11, 2024, plaintiff filed a timely notice of appeal pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017) (allowing for interlocutory appeal after denial of injunction request).[7]

¶ 68                                II. ANALYSIS

¶ 69                            A. Standard of Review

¶ 70    The parties disagree about the applicable standard of review. Although plaintiff acknowledges that generally orders denying motions for preliminary injunctions are reviewed under an abuse of discretion standard, plaintiff nevertheless contends that *de novo* review is appropriate here because the circuit court reviewed a question of law without making any factual findings. The City disagrees, contending that abuse of discretion is proper. Based upon our review of the proceedings, we agree with the City that the appropriate standard is abuse of discretion. *Smith v. Department of Natural Resources*, 2015 IL App (5th) 140583, ¶ 22. As such, we will reverse the court's denial of the motion for preliminary injunction only if its ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the court's view. *Id.* "The

---

[6]On April 15, 2024, plaintiff filed an unopposed motion to submit new evidence which purportedly showed that the City had mailed notice of the proposed Corner Lot development to the prior owners of plaintiff's property rather than plaintiff. The motion was granted on April 18, 2024.

[7]The City is the only defendant that filed a response in this appeal.

relevant question for the reviewing court is whether there was a sufficient showing made to the circuit court to sustain its order." *Id.*

¶ 71                                    B. Arguments

¶ 72    On appeal, plaintiff's challenge to the circuit court's denial of its request for preliminary injunction is multifaceted. Before proceeding, we set forth the applicable law. "The purpose of a preliminary injunction is to prevent a threatened wrong or a continuing injury pending a trial on the merits of the case." *Pardilla v. Village of Hoffman Estates*, 2023 IL App (1st) 211580, ¶ 30. "It provides relief to an injured party and preserves the status quo until a trial is held." *Id.* "A preliminary injunction is an extraordinary remedy" and is generally disfavored. *Id.* ¶ 31. Thus, a preliminary injunction should only issue if the harm to the plaintiff without such relief is likely to outweigh the harm to the defendant if relief is granted. *Roxana Community School District No. 1 v. WRB Refining, LP*, 2012 IL App (4th) 120331, ¶ 23.

¶ 73    "A party seeking a preliminary injunction must demonstrate (1) a clearly ascertained right in need of protection, (2) irreparable injury in the absence of an injunction, (3) no adequate remedy at law exists, and (4) a likelihood of success on the merits of the case." *Pardilla*, 2023 IL App (1st) 211580, ¶ 32. "The party seeking the injunction must raise a fair question concerning the existence of the claimed right, *i.e.*, a fair question as to the existence of each element." (Internal citation omitted.) *Smith*, 2015 IL App (5th) 140583, ¶ 21. A party must "plead facts which clearly establish a right to injunctive relief, and allegations consisting of mere opinion, conclusion or belief are not sufficient[.]" *In re Marriage of Stamberg*, 218 Ill. App. 3d 333, 337 (1991). Courts do not decide the case on the merits in such proceedings (*Pardilla*, 2023 IL App (1st) 211580, ¶ 32), nor do they consider contested issues of fact. *Smith*, 2015 IL App (5th) 140583, ¶ 22.

¶ 74                1. HODC and Mt. Pisgah's Participation in the Hearing

¶ 75    We first address plaintiff's offhand reference that the circuit court erred in allowing Mt. Pisgah and HODC to participate in the preliminary injunction hearing. Plaintiff argues, without citation to any authority, that the testimony elicited from Jackson's improper cross-examination by these parties was ultimately relied upon by the court in its decision, despite neither party having standing to participate. The City responds that this argument is forfeited pursuant to Supreme Court Rule 341(h)(7). We agree. Although it is true that plaintiff raised standing objections repeatedly during the hearing, plaintiff has failed to support this contention here on appeal with any authority as required by supreme court rules and thus has forfeited this argument. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (appellant's contentions must be supported by citation of supporting authorities); *International Union of Operating Engineers Local 965 v. Illinois Labor Relations Board, State Panel*, 2015 IL App (4th) 140352, ¶ 20 (a party forfeits review of issue on appeal by failing to support its argument with citation to authorities). Moreover, plaintiff's own motion indicates that it sought relief against *all* defendants, and it is undisputed that any effort to enjoin the sale of the Corner Lot would affect Mt. Pisgah and HODC.

¶ 76                    2. Permanent v. Preliminary Injunction

¶ 77    Next, plaintiff contends that the circuit court incorrectly applied the standard of proof for a permanent injunction, which is higher than the standard for preliminary injunction, to its assessment of the evidence. Plaintiff's support for this contention is based on certain case citations contained within the court's written order. Unsurprisingly, the City denies that the court conflated the two standards and that the court's citation to various legal authority was to elucidate its point that injunctive relief was not available for injuries that have not or may never occur.

¶ 78    We agree with the City and do not find the court assessed the merits of plaintiff's motion by an incorrect standard. We acknowledge that the cases cited by the circuit court in its order did

not involve requests for preliminary injunctive relief. See *Lewis E. v. Spagnolo*, 186 Ill. 2d 198, 201-04 (1999) (dismissal of complaint pursuant to section 2-615 of the Code of Civil Procedure regarding adequacy of school district conditions); *Village of Wilsonville v. SCA Services, Inc.*, 86 Ill. 2d 1, 6 (1986) (trial on the merits regarding a chemical-waste disposal site presenting a public nuisance); *Garner v. County of DuPage*, 8 Ill. 2d 155, 156, 160 (1956) (dismissal of complaint for injunctive relief where plaintiff failed to show actual or threatened harm or adequate standing challenging zoning ordinance); *Swain v. Winnebago County*, 111 Ill. App. 2d 458, 441, 472 (1969) (dismissal of complaint seeking declaratory judgment that zoning ordinance was invalid). However, it is clear that the court cited those cases merely to discuss the governing law regarding standing, and thus, a protectible interest, and not for the burden of proof necessary for plaintiff to prevail on its motion. See, *e.g.*, *In re Marriage of Stamberg*, 218 Ill. App. 3d at 337 ("In order to be granted a preliminary injunction, [plaintiff] must have standing in the cause, which requires a showing of a clearly ascertainable right or interest."); *Village of Lake in the Hills v. Laidlaw Waste Systems, Inc.*, 143 Ill. App. 3d 285, 292 (1986) ("As the concept of standing relates to a preliminary injunction, it requires a plaintiff to establish that he [or she] has a clearly ascertainable right or interest which needs protection" and "[g]enerally, the doctrine of standing makes it necessary for a party seeking such relief to allege an injury in fact to some substantive interest [they] possess[] which is recognized by statute or common law.")

¶ 79    Further, the court's ultimate and express conclusion that plaintiff had not raised a *fair question* as to the sought relief indicates that the court assessed the evidence applying the appropriate standard.  See, *e.g.*, *Smith*, 2015 IL App (5th) 140583 ¶ 21 (party seeking preliminary injunction must raise a fair question as to the existence of the claimed right); *Keefe-Shea Joint Venture v. City of Evanston*, 332 Ill. App. 3d 163, 169 (2002) ("[T]he plaintiff does not carry the

same burden of proof [on a motion for preliminary injunction] that is required to prevail on the ultimate issue"); *cf. Butler v. USA Volleyball*, 285 Ill. App. 3d 578, 582 (1996) ("[P]ermanent injunctions are designed to extend or maintain the status quo indefinitely when the plaintiff has shown irreparable harm and there is no adequate remedy at law," and thus necessarily requires that the court "decide[] the plaintiff's success on the merits of the case."); *Kopnick v. JL Woode Management Company, LLC*, 2017 IL App (1st) 152054, ¶ 34 (noting that permanent injunctive relief is contingent upon the plaintiff prevailing at trial on the merits of its claim). Here, the court made no finding regarding the ultimate merits of the case, but instead confined its discussion to one or two elements applicable to a preliminary injunction analysis, which we discuss below.

¶ 80                                 3. Merits of the Order

¶ 81     Plaintiff argues that the court erred in finding that it did not have a protectible right to dispute the City's zoning decisions. Plaintiff characterizes this as the only "conclusive finding" the court actually made, while also acknowledging that some of the court's order also touched upon other elements, such as irreparable harm. As such, plaintiff further contends that the circuit court also erred in failing to find that it would suffer irreparable harm, citing one case, *Keefe-Shea Joint Venture v. City of Evanston*, 332 Ill. App. 3d 163 (2002), in support.

¶ 82     The City responds that the circuit court correctly denied the motion, as plaintiff failed to show any protectible interest, particularly with regard to its hypothetical fears about environmental damage and irreparable harm to its building and the surrounding community. Moreover, the City points to the Second Remediation Letter, the ordinances and corresponding conditions in place to mitigate any concerns, and the fact that construction permits had not yet been issued to either Mt. Pisgah or HODC, as illustrative that plaintiff did not meet its burden on showing any imminent or real harm.

¶ 83 Generally, a zoning ordinance may be challenged on constitutional grounds as being arbitrary and capricious and unrelated to public safety, health, and general welfare. See, *e.g.*, *LaSalle National Bank of Chicago v. Cook County*, 12 Ill. 2d 40, 46-47 (1957). Here, the parties' arguments with regard to plaintiff's zoning challenge implicate two required elements to sustain a motion for preliminary injunction, a showing of clearly ascertainable right and irreparable harm. To establish a clearly ascertainable right in need of protection, a plaintiff must raise a fair question that he has a substantive interest recognized by statute or common law. *Delta Medical Systems v. Mid-America Medical Systems, Inc.,* 331 Ill. App. 3d 777, 788-89 (2002). As for irreparable harm, a plaintiff must establish evidence of an injury which cannot be adequately compensated by damages or be measured by any certain pecuniary standard. (Internal citation and quotations omitted.) *Diamond Savings & Loan Co. v. Royal Glen Condominium Ass'n*, 173 Ill. App. 3d 431, 435 (1988). However, "[i]rreparable injury does not necessarily mean injury that is great or beyond the possibility of repair or compensation in damages, but is the type of harm of such constant or frequent recurrence that no fair or reasonable redress can be had in a court of law." *Bally Manufacturing Corp. v. JS&A Group, Inc.*, 88 Ill. App. 3d 87, 94 (1980).

¶ 84 To begin, we must first dispense with what permeates a great deal of plaintiff's brief, namely its repeated attempts to argue that the City failed to provide sufficient notice for the proposed Corner Lot development, beginning with the RFP and continuing to the public hearings, which, according to plaintiff, should invalidate the development projects at the outset. Plaintiff's contention is unavailing. Procedurally, the City's Code contemplates both published and mailed notice, and the city's ordinances indicate that the first LUC hearing was published in the Evanston Review. See Evanston Code § 6-3-8-10, "Procedures for Decisions on Major Variations." Further, even assuming that plaintiff did not receive mailed notice of the initial LUC hearing, the record

reflects that plaintiff nevertheless appeared and even received a continuance to present oral and written testimony, continued to attend hearings either in person or virtually until the ordinances were approved almost six months later, and even had some of its concerns about the project memorialized in the adopted ordinances. See Evanston Code § 6-3-8-10(B) ("The failure of delivery of such [mailed] notice, however, shall not invalidate any such hearing" regarding major variation requests and "[s]ubsequent notices are not required for continuances of a hearing, if any"); *Petersen v. Chicago Plan Comm'n of the City of Chicago*, 302 Ill. App. 3d 461, 466 (1998) ("The essence of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.")

¶ 85    Turning to the order at issue, although at first blush the circuit court appeared to begin to address plaintiff's failure to establish an ascertainable right, it is clear that the greater part of the order is concerned with plaintiff's failure to show irreparable harm. Indeed, the court directly quoted multiple portions of Jackson's testimony in its decision, in particular highlighting the fact that any feared physical damage to plaintiff's building or feared exposure to pre-existing contaminants was based on mere speculation. After recounting the testimony, the court concluded that Jackson's fears had failed to demonstrate that plaintiff had or was likely to suffer the feared harms, in particular because plaintiff had "failed to provide [any] scientific studies or expert witness reports or testimony supporting any claim of imminent injury" and thus, "the fears of its principal [were] simply that—fears without any supported basis."

¶ 86    In focusing on the irreparable harm aspect of the court's analysis, then, we do not find the circuit court's conclusion to be arbitrary or unreasonable. See *Pierce v. Cheruki*, 2022 IL App (1st) 210339, ¶ 10 (Under the abuse of discretion standard, "the question is not whether the reviewing court agrees with the action taken by the [circuit] court, but whether the [circuit] court acted

arbitrarily, without employing conscientious judgment, or whether, in view of all the circumstances, the court exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted.") (Internal citation and quotations omitted.) It is true that we have found that a plaintiff may seek injunctive relief for a prospective nuisance. See *Helping Others Maintain Environmental Standards v. Bos*, 406 Ill. App. 3d 669, 689 (2010). "However, the allegations necessary to bring such a claim must not be based on speculation or conjecture." *Village of Willow Springs v. Village of Lemont*, 2015 IL App (1st) 152670, ¶ 48; *Bell Fuels, Inc. v. Butkovich*, 201 Ill. App. 3d 570, 572 (1990) ("[E]quitable relief will not be granted where only a speculative possibility of injury is advanced and where injury is contingent upon uncertainties.") Here, it is difficult to view plaintiff's proffered evidence as anything but conjecture at this stage in the proceedings. Indeed, plaintiff's own evidence reflects that much has been done to ensure, not only its safety, but also the safety of the community at large.

¶ 87    To begin, as of 2018 through its Second Remediation Letter, the IEPA specifically designated the Corner Lot as an area that could be developed for residential properties subject to certain conditions and thus, by its own terms, operated as "prima facie evidence" that use of the land was presumptively safe. These conditions were acknowledged by the City in its 2020 RFP, were known to HODC at the time it submitted its variation request as shown through Koenig's affidavit and testimony, and the various ordinances approving Mt. Pisgah and HODC's variance requests contemplated such conditions in relation to the development projects.

¶ 88    Next, plaintiff's submission of the applicable ordinances rebuts her own speculation that the City was not concerned about damage to plaintiff's historical property and the flooding issues previously suffered by the area. Indeed, plaintiff admitted that conditions within Ordinance 35-0-23 were specifically added following various public hearings at which plaintiff had been allowed

to present evidence and testimony on these concerns. Such conditions required HODC to work with the Preservation Commission to prevent any structural damage to plaintiff's property, as well as ensure that its building complied with applicable water management regulations, which Koenig testified to having done so in January 2024.

¶ 89    Last, although plaintiff complained of not being provided with information as to whether the development adhered to the ordinances' conditions, the record does not reflect that building permits have been issued by the City to begin development. It is true that Ordinance 35-0-23 recites that HODC's construction management plan must be shared with the owners of 1817 Church Street, *i.e.*, plaintiff's property, to address construction impacts. However, it was Koenig's testimony that he attempted to meet with plaintiff's representative to discuss the basement construction to no avail, and Jackson's testimony corroborated this where she indicated that she was advised not to meet with HODC once litigation began.

¶ 90    Further, despite plaintiff's characterization that the development projects were "pushed through" and "vague," plaintiff's argument is belied by the record. Both proposals were submitted in 2020, variance applications were submitted in 2022 after community outreach, and then there were six months of public LUC hearings in 2023, each of which plaintiff attended, gave testimony and was even granted a continuance. Further, as shown in the record, the City has agreed to not move forward with the project until the litigation has completed. See *Village of Willow Springs*, 2015 IL App (1st) 152670, ¶ 51 (generic allegations of property value diminishment, lost tax revenue, and road congestion insufficient to allege irreparable harm, especially where new proposed facility had not yet been constructed, let alone approved for construction).

¶ 91    "The requirement of the showing of imminent injury is not satisfied by proof of a speculative possibility of injury and such relief will not be granted to allay unfounded fears or

misapprehensions." (Internal citations and quotations omitted.) *Smith*, 2015 IL App (5th) 140583, ¶ 27. Here, plaintiff failed to meet its burden to establish a fair question of irreparable harm. Based on this determination, we need not address any remaining elements to obtain a preliminary injunction. *Id*. Ultimately, as the movant, plaintiff bore the burden to show it was entitled to preliminary injunctive relief, an extraordinary and generally disfavored remedy. Without any evidence to the contrary, there is no discernible reason in the record to disturb the court's findings. Accordingly, we do not find that the circuit court abused its discretion in denying plaintiff's motion for preliminary injunction.

¶ 92                              III. CONCLUSION

¶ 93     For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

¶ 94     Affirmed.